**In the Matter of the WELFARE OF P.J.K. and J.L.K.**

No. C6–83–2026.

Supreme Court of Minnesota.

June 14, 1985.

Thomas L. Johnson, Hennepin County Atty., Janeen E. Rosas, Minneapolis, for Hennepin County.

Jane A. Kammerman, Minneapolis, for Mother.

David Knutson Asst. Public Defender, Minneapolis, guardian ad litem.

John Peter Elexis, Minneapolis, for Father.

YETKA, Justice.

This case comes to this court on a petition for further review of the court of appeals' decision, 356 N.W.2d 69, reversing the decision of the Hennepin County Juvenile Court terminating the parental rights of the father. We reverse the court of appeals and reinstate the judgment of the juvenile court.

Minn.Stat. § 260.221 (1984) allows termination of parental rights for any one of a number of grounds. The juvenile court terminated the father's parental rights on three of the statutory grounds. They are:

> That a parent is palpably unfit to be a party to the parent and child relationship because of a consistent pattern of specific conduct before the child or of specific conditions directly relating to the parent and child relationship either of which are determined by the court to be permanently detrimental to the physical or mental health of the child; or

> That following upon a determination of neglect or dependency, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the determination; or

> \* \* \* \* \* \*

> That the child is neglected and in foster care.

Minn.Stat. § 260.221, subds. 4, 5, 7 (1984). We find that there is adequate evidence to sustain the trial court's finding on each of these separate grounds, and we, therefore, reverse the court of appeals.

A brief summary of the facts is required. The father of the two children whose welfare is the subject of this case is mentally retarded with an IQ of 68. Throughout his life, he has shown an inability to hold a job for any length of time. He and the children's mother, who is also mentally retarded, separated in October 1974 and dissolved the marriage in September of 1975.

Their two children are also mentally and emotionally handicapped. P.J.K., who is now 11, is more handicapped than his brother J.L.K., who is now 10. P.J.K. has difficulty walking, dressing, and relieving himself. He is reluctant to talk and far behind his age group in school. J.L.K. is developmentally delayed. Although given to nervousness, facial tics, and speech problems, he is the brighter, more active, and more outgoing of the two. J.L.K. looks after P.J.K. much of the time and often answers for P.J.K. when P.J.K. is spoken to.

After the dissolution, the children were in the custody of their mother. The living conditions were so dismal that the children

were removed from the mother's custody, determined dependent, and placed in a shelter. During the whole time that the children were in their mother's custody, the father never visited them or expressed any concern for their living conditions.

After the children were removed, the father petitioned for their custody. A custody study was conducted. It recommended that, as of January 8, 1979, neither parent should have custody, but that the county should retain custody under the dependency and neglect statutes. The author of the study had serious doubts about the father's fitness as a parent:

> [The father], similarly, appears a slow-learning and inadequate person who has, at best, limited knowledge of his children's problems and needs. There is ample indication that if both [P.J.K.] and [J.L.K.] are to grow into healthy, happy, reasonably well-adjusted children, they will need the very best in a home environment, adequate parenting, love, guidance, and supervision, if this is to be accomplished. It seems apparent that [the woman], who [the father] plans to marry, has neither the intellectual ability to care for herself, much less assume responsibilities for two children, particularly two children who have been as deprived and neglected as these. I am gravely concerned with regard to [the father's] temper, his seeming inability to hold jobs and more importantly, his lack of any real understanding of his children. For these reasons I cannot recommend [the father] as a custodian for his children.

The matter was resolved by a court order on May 11, 1979. The father admitted that the children were dependent. Under that disposition, the father was required to seek individual counseling, attend parenting classes, follow through on any recommendation of a psychological evaluation, meet with a social worker to inform that social worker of his address, and visit with the children under supervision.

The father has done little to follow through with the goals of the 1979 order.

Some individual counseling apparently was provided. The father also attended group parenting classes under Dr. Pi Nian Chang, a pediatric psychologist with the University of Minnesota. Dr. Chang recommended that the father stop attending, however, when, early on, it became evident that the father was not benefiting because of his inability to comprehend and discuss the class topics. In a report, Dr. Chang wrote, "However, I do see the need for continuous enrollment in parent training groups so that he will develop more concrete skills." The father attended no other parenting classes.

The father's relationship with the social workers on his case has been turbulent. He believes that he has been persecuted and given the "run-around" in the social work bureaucracy. He has been verbally abusive to both the social workers and to the foster parents of his children. In short, the father blames Hennepin County for keeping his children away from him and refuses to work with them.

Visitation has also been a problem. On the rare occasions when he has visited the children, their reactions have been adverse. Both foster mothers noticed that, after the visits, the children would be hyperactive and upset for several days, rocking and wetting their beds. When the father did not visit the children, they were less agitated, the rocking and bedwetting subsided. The boys hardly ever talked about their father when he was away.

The father's visitation record has been poor. From the May 11, 1979 order until August 1979, the father visited the boys under supervision. Barbra Jarmuzek, the boys' foster mother at the time, had a number of altercations with the father. He shook his fist at her because she had taken tinker toys with sharp ends away from the boys for fear they might poke themselves in the eyes. Another time, late in returning the children to the foster home, the father, in an argument with Ms. Jarmuzek, cursed her and created a disturbance in the neighborhood. Because of the father's

abusiveness, visitation was suspended until December of 1979.

In December of 1979, Southside Services, Inc., provided a staff member, Lynda Meador, to supervise the father's visits with the children. After about a year of providing supervision, however, Southside could not afford to continue and had to transfer the supervision to Domestic Relations Services. The father would not accept supervised visitation and would not see his children until a year later in December 1981.

Shortly thereafter, the father disappeared. Social services looked for him, but could not find him. The father's own attorney did not know where he was. It eventually came to light that he had moved to the Iron Range to find work. The father's explanation for why he disappeared without contacting anyone about his whereabouts was that he was so frustrated with the county that he was afraid he might hit someone. No visits were made to the children until December 1982. In 1983, the father visited his sons in February, March, and October.

Dr. Susan Lund, a clinical psychologist who specializes in "multiple problem children and families," observed the father on a visit with his sons. She found that the children did not speak much about their father and that their feelings were mixed—a combination of a desire to see and a fear of their father. She observed that the father did not understand "basic interactional and parenting principles." He expected too much out of the children and was much too directive with them, causing the boys to be frustrated and fearful of him. It was Dr. Lund's opinion that the boys would be difficult for a parent with normal intelligence and parenting skills to handle. Without a structured, stable environment, the children would be unlikely to develop intellectually and emotionally. Dr. Lund's opinion was that the father could not provide such an environment for the children and that his problems are irreversible, making it unlikely he will ever be able to parent his children. The children's

guardian ad litem, Susan Stacy, who has been with the case since the dependency/neglect action began in 1978, also feels the father will never be able to care for his children.

There was some favorable evidence on the father's behalf. Lynda Meador from Southside Services testified. She supervised visitation in 1980. She believed that the father loved his children and felt that the children warmed up to their father after visitation went on for awhile. Carla Lehtinen, the director of Southside Services, also testified to the father's love for his children. He would come to their offices regularly and talk about the boys. She admitted, however, that once the supervision had stopped, the father did not have the inner ability to continue his relationship with his children.

The father himself testified. He denied his abusive behavior towards the social workers and the foster parents, blamed Hennepin County for giving him the "run-around," and claimed he could help his sons. Although currently unemployed and chronically unable to hold a job, he claimed he would find a job to support himself and the boys and that he would find someone to marry to take care of them while he was gone.

The children's present foster mother, Ellie Perron, is an elderly lady who feels that her age will not allow her to continue as the children's full-time custodian. The children's mother has agreed to terminate her parental rights, provided that the father's rights are similarly terminated. Hennepin County petitioned for termination of the father's parental rights, presumably, to place the children for adoption into a permanent home situation.

The issue on appeal is whether there was clear and convincing evidence to support the trial court's finding that the necessary conditions existed for termination of the father's parental rights. We find that there was.

 Termination of parental rights is a very troubling, but sometimes necessary,

part of the law. Although parents' right to custody of their children should not be taken from them but for "grave and weighty reasons," the law secures parents' right to custody "only so long as they shall promptly recognize and discharge their corresponding obligations." *In re HGB*, 306 N.W.2d 821, 825 (Minn.1981). In Minnesota, strict statutory factors must be met before parental rights can be terminated. *See* Minn.Stat. § 260.221 (1984). The trial court must make specific findings that meet the statutory requirements. *Zerby v. Brown*, 280 Minn. 514, 516, 160 N.W.2d 255, 257 (1968). The court need find that only one of the statutory conditions exists to terminate parental rights. *In re R.M.M.*, 316 N.W.2d 538, 541 (Minn.1982). Although those findings "will not be overturned in a termination case unless 'clearly erroneous,'" this court will "continue to exercise great caution in termination proceedings, finding such action proper only when the evidence clearly mandates such a result in accordance with the statutory grounds." *In re Solomon*, 291 N.W.2d 364, 367 (Minn.1980).

The trial court relied on three of the statutory reasons for termination: subdivisions 4, 5, and 7 of the statute. Subdivision 4 provides for termination if *"specific conditions* directly relating to the parent and child relationship" are found to make the parent "palpably unfit" to parent the child and that that condition is "permanently detrimental to the physical or mental health of the child." Minn.Stat. § 260.221, subd. b(4). An older version of the statute allowed termination of parental rights if the parents were found unfit because of "debauchery, intoxication or habitual use of narcotic drugs, or repeated lewd and lascivious behavior, or *other conduct* found by the court to be likely to be detrimental to the physical or mental health or morals of the child." Minn.Stat. § 260.221, subd. b(4) (1978) (emphasis added).

In the context of mental illness, which is analogous to mental retardation in this context, this court interpreted the statute:

[M]ental illness in and of itself shall not be classified as "other conduct" which will permit termination of parental rights. Rather, in each case, the actual conduct of the parent is to be evaluated to determine his or her fitness to maintain the parental relationship with the child in question so as to not be detrimental to the child.

*In re Kidd*, 261 N.W.2d 833, 835 (Minn. 1978). By analogy then, mental retardation alone is not considered reason enough to terminate parental rights under the old statute.

█ The "other conduct" language was dropped in a total rewriting and modernization of the statute. Act of April 14, 1980, ch. 561, § 10, 1980 Minn.Laws 775, 779. The new language appears to us to allow the court to look not just at conduct, but at the actual condition, mental illness or mental retardation, and determine if the parent is unfit. Even under this standard, however, the mere fact of mental retardation or illness alone is insufficient to show that parental rights should be terminated. Rather, the statute requires that the retardation or illness directly relate to parenting and that it be permanently detrimental to the physical or mental health of the child.

█ In this case, the court found that the father, because of his retardation, lacks the capacity to learn the skills needed to parent and properly care for his sons. Both children are retarded and need special attention. A family of average intelligence and parenting skills would be pressed to care for the boys' needs. The father could not grasp even the most basic parenting skills as taught in Dr. Chang's parenting class. The father had little to do with the boys' rearing, showed no concern for their condition when in their mother's care, and visited only occasionally since then. What appearances the father has made in the children's lives has produced trauma. In addition to her concerns about possible physical abuse, emotional abuse, and neglect, Dr. Lund was convinced the children would "regress or fail to develop to their full level of potential" if placed in their

father's care. Since the father's retardation is permanent, Dr. Lund, Susan Stacy, and other professionals involved have little or no hope that the father can ever learn the skills necessary to care for the boys. The only contrary evidence is the father's own testimony and Southside workers who, though testifying to the father's love for the boys, admitted that, without supervision, the father did not have the inner ability to continue his relationship with his children. Thus, the vast weight of evidence seems to show that the father's mental retardation, which is permanent, renders him unable to care even minimally for the needs of his children. Clear and convincing evidence of the father's permanent unfitness detrimental to his children's mental health and development has been presented. Thus, the trial court's findings were not erroneous, and the court of appeals incorrectly reversed the trial court.

Subdivision 5 allows for termination of parental rights if the children have been determined "neglected or dependent" and "reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the determination." Minn. Stat. § 260.221, subd. 5 (1984). The court of appeals correctly points out that the direct cause for the children being adjudged dependent was the condition of the children's mother's home, but failed to recognize the father's role in the dependency determination. The father petitioned for custody of the children, but, by his own admission, was unable to take custody because he lacked the parenting abilities to care for them. Had he been able to care for them, they would not have been judged dependent. Thus, the father's inability was also a cause for the dependency determination.

■ Specific goals were set by the court to alleviate the father's inability to care for the children. He was to seek individual counseling, attend parenting classes, follow through with recommendations of a psychological evaluation, meet with a social worker, keep appointments, inform the social worker of his address, and visit his children regularly. He did attend some individual counseling, but not with any regularity. He was unable to grasp basic parenting skills in a group class. The father failed to keep appointments with social workers and disappeared for nearly a year without informing anyone of his whereabouts. Finally, his record of visitation with his children has been terrible. Although he claims that his lack of visitation is the fault of the social service department for requiring supervision, this is a lame excuse. Every professional and every court order dealing with the father has required that visitation be supervised. The fact that the father resisted the supervision to the point of refusing to see the children showed, as Dr. Lund put it, that venting his anger at the social system was more important to him than his relationship with his children. In any respect, as the father's own witness admitted, once regularly scheduled supervision from Southside ceased, the father did not have the inner ability to continue his relationship with the boys. Therefore, clear and convincing evidence supports the trial court's determination that the father's parental rights should be terminated for failure to correct the conditions which led to the dependency determination and the court of appeals is incorrect in reversing.

Subdivision 7 allows termination of parental rights if the child is determined "neglected and in foster care." Minn.Stat. § 260.221, subd. 7 (1984). This subdivision was added in 1978. Act of March 28, 1978, ch. 602, § 10, 1978 Minn.Laws 365, 370–71. The effect of this and several other amendments was to incorporate the provisions of Minn.Stat. § 260.155 (1984) into a proceeding for the termination of parental rights. *In re HGB*, 306 N.W.2d at 826. The factors to be considered when determining neglect are:

(1) The length of time the child has been in foster care;

(2) The effort the parent has made to adjust his circumstances, conduct, or condition to make it in the child's best interest to return him to his home in

the foreseeable future, including the use of rehabilitative services offered to the parent;

(3) Whether the parent has visited the child within the nine months preceding the filing of the petition, unless it was physically or financially impossible for the parent to visit or not in the best interests of the child to be visited by the parent;

(4) The maintenance of regular contact or communication with the agency or person temporarily responsible for the child;

(5) The appropriateness and adequacy of services provided or offered to the parent to facilitate a reunion;

(6) Whether additional services would be likely to bring about lasting parental adjustment enabling a return of the child to the parent within an ascertainable period of time; and

(7) The nature of the effort made by the responsible social service agency to rehabilitate and reunite the family.

Minn.Stat. § 260.155, subd. 7 (1984). The net result of the amendment was to "incorporate a balancing process into the termination of parental rights proceedings. * * [T]his process considers both the interests of the parents and the best interests of the child." *In re HGB*, 306 N.W.2d at 827.

■ In this case, the children have been in foster care for the vast majority of their lives, a little over 7 years. The father has made few efforts, almost none with any success, to make it in the children's best interest to live with him. Considering the many and special needs of the children and the father's inability to care for those needs, it would seem in the children's best interest not to be with the father. The father had visited the children within 9 months of the filing of the petition although that visit was after nearly a year's absence. The father's contact with the agency responsible for the children has been poor, to the point that he even disappeared for over a year without contacting anyone involved with this case. The services provided for the father have not been lavish; however, he was provided with individual and group parenting skills training. His own inability to learn in those groups caused him to discontinue the training. There are grave doubts that his mental capacities will ever allow him to learn parenting skills sufficient to care for his children. The agencies made efforts, in spite of the father's resistance to those efforts, to reunite the father with his children, having secured the services of psychiatric professionals and steered the father to parenting classes. Balancing all of these factors would seem to weigh in favor of terminating the father's parental rights. The court of appeals was, thus, in error in reversing the trial court under subdivision 7.

■ The court of appeals also seems to have grounded its reversal of the termination on the fact that "there is no evidence that adoption of the children is an immediate possibility." It is evident that one of the purposes of the termination of parental rights statute is to facilitate adoption. *In re Forrest*, 311 Minn. 11, 246 N.W.2d 854 (1976). However, nowhere in the statute is imminent adoption an element of a termination proceeding. The court of appeals seems to have added a requirement not contemplated by the legislature. It is apparent that if the children are ever to be adopted or placed in a semi-permanent foster care, termination of parental rights would facilitate that process. An imminent adoption is not required and to so require might well hinder the adoption process.

Thus, here we have a situation where the father admits, through counsel at oral argument, that he cannot support the children, should not have custody, wants what is best for the children, and might even consent to adoption if he were requested to grant consent. Yet, he does not wish to give up visitation rights that were very infrequently used and were disruptive to the children. Were the court to deny forfeiture of parental rights under the facts presented here, the state might be discouraged to seek similar termination rights in a number of cases and thousands of children

might be left in a limbo status without hope of placement in a permanent foster home or adoption. Heart wrenching as it is to deny any natural parent rights of visitation, we find that the trial court's decision should not be disturbed. It was in a better position to ascertain the facts and make findings than is an appellate court.

The court of appeals is reversed and the judgment of the trial court is reinstated.