In the Matter of the WELFARE OF J.J.B., a minor child.

Nos. C8–84–1647, C4–84–2178.

Court of Appeals of Minnesota.

June 25, 1985.

Thomas G. Johnson, Schmidt, Thompson, Thompson & Johnson, P.A., Willmar, for appellant.

Carol Leopold, Willmar, Guardian Ad Litem.

Ann M. Gustafson, Asst. Co. Atty., Willmar, for respondent.

Rolf Sletten, Willmar, for minor child.

Heard, considered and decided by FOLEY, P.J., and FORSBERG and LESLIE, JJ.

## OPINION

FORSBERG, Judge.

Appellant L.B. appeals from an August 9, 1984 order terminating her parental rights. The trial court found that the child had been adjudicated dependent and that appellant would not likely change her behavior in the future pursuant to Minn.Stat. § 260.221(b)(5) (Supp.1983). The mother further appeals from the subsequent termination of her visitation rights in a November 14, 1984 order.

We reverse.

## FACTS

J.J.B. was born on January 17, 1979. On November 26, 1979, the juvenile court found her a dependent child as provided in Minn.Stat. § 260.015(6)(d) (1978). Appellant was not represented by counsel at the dependency hearing. The dependency order was based primarily on appellant's prolonged mental illness, diagnosed as schizophrenia. This illness resulted in appellant's hospitalization on at least 13 occasions

since childhood and her voluntary placement of the child in foster care three times during 1979. The child was placed under the supervision of Kandiyohi welfare services and a foster plan was developed. Over the next two years the child remained in foster care and appellant had over 200 visitations with her.

In June 1981, a new foster plan was created at appellant's request which placed mother and child in the home of another adult. The plan appeared to be successful; appellant's stability noticeably improved and the child behaved normally in her presence. Tension later developed between appellant and another boarder. When the homeowner notified appellant of her intent to move, appellant told welfare officials that she was moving out. On December 1, 1981, a petition for termination of parental rights was filed. The court granted the petition on March 16, 1982, following a two-day hearing. Appellant's visitation rights with the child ceased during this period, from January 1982 to the fall of that year.

On August 4, 1982, a three judge panel reversed and remanded the termination order finding insufficient evidence of permanently detrimental behavior to support termination under § 260.221(b)(4) (1980). The panel also found that the four-month period between dependency and termination was not a reasonable amount of time in which to judge noncompliance under § 260.-221(b)(5), notwithstanding appellant's numerous hospitalizations.

On remand, in an October 29, 1982 order, the trial court adopted an extensive rehabilitation plan developed by one of appellant's caseworkers. The seven-step plan set out detailed conditions for regaining custody of J.J.B. including visitation guidelines and requirements for psychological testing and follow through. The plan also detailed goals for the child's needs, limitations, and scheduling. As appellant fulfilled the conditions, the plan increased visitation and provided for the eventual return of the child. Kandiyohi County was to maintain legal custody. Appellant was not provided a copy of the plan and the details and conditions were not discussed by her caseworkers.

Between October 1982 and February 1983, appellant had sporadic contact with social service agencies. She also missed two scheduled visitations, one resulting from a suicide attempt on December 10, 1982. On January 20, 1983, a hold order confined appellant to the Brainerd State Hospital for up to a year. On February 17, 1983, appellant's caseworker petitioned the court for termination of appellant's parental rights citing noncompliance with the October 1982 order. A hearing was held on April 5, 6, and May 17, 1984. At the hearing, two expert witnesses testified directly in support of termination—Dr. Paul Borreson, a psychologist with a Ph.D. in mental retardation, and Dr. John O'Regan, a clinical psychologist. Appellant's two caseworkers also supported termination. Dr. John Bonde, a psychiatrist at Brainerd State Hospital, concurred in the general diagnosis of appellant's mental illness and concluded that full recovery in the future was unlikely. He offered no opinion on appellant's ability to parent her child. Dr. George Heikens, a consulting psychologist with a Ph.D. in behavior genetics, directly opposed termination.

The testimony adduced at trial was extensive. The expert witnesses agreed that appellant suffered from a mental disorder labeled Organic Personality Syndrome that manifests itself in severe mood swings, paranoid thought process, manipulative and impulsive behavior and poor social judgment. The finding directly contradicted an earlier diagnosis that appellant was schizophrenic.

Dr. Borreson was the only expert witness to observe appellant and child together. He classified the interaction between mother and child on eight occasions as "hyper activity"; rapid game playing and little conversation. The bulk of his testimony focused on appellant's immature behavior and her overriding need to please the child at the expense of normal discipline. He

also stated that the child told him she wanted to stay with her foster parents.

Dr. O'Regan's support for termination was based on five hours of therapy with appellant. He concluded that appellant's lack of insight and suicidal tendencies established a poor prognosis for her ability to function effectively as a parent.

Dr. Bonde's testimony was based on hundreds of personal contacts with appellant. He specifically noted that appellant was not to blame for her illness but that full recovery in the future was unlikely. He also concluded that regaining custody of J.J.B. was a major theme in appellant's life, a conclusion shared by Dr. Heikens.

Dr. Heikens' testimony centered on appellant's overriding desire to regain custody of J.J.B. and the resulting suicide attempts when that goal was frustrated. His recommendation that appellant and her daughter be placed in a group home environment was based on two visits with appellant and one visit with the child and her foster parents.

Other evidence brought out at trial included appellant's hospitalization on 27 occasions between August 1982 and October 1984, her eviction in October 1982 for failure to pay rent, her cancellation of 20 scheduled visitations between January 1982 and March 1983, and her sporadic communication with social workers. The trial court also heard testimony from the child's foster mother who stated that J.J.B. had matured in her custody and from the supervisor of a foster group home near appellant's residence.

After consideration of this testimony and extensive psychological reports, the court ordered termination of appellant's parental rights on August 9, 1984. On November 8, 1984, the court terminated appellant's visitation rights based on findings of appellant's continued commitment to mental health facilities, cancellation of appointments and her attempt to violate visitation restrictions.

## ISSUE

Is reversal of a termination order required when a mentally deficient mother with suicidal tendencies is not provided with a written case plan or verbally notified of its contents?

## ANALYSIS

In cases involving a termination of parental rights, specific standards apply. First, a natural parent is presumed to be a fit and suitable person to meet the needs of her child. *Matter of Welfare v. Chosa*, 290 N.W.2d 766, 769 (Minn.1980). Second, this court will uphold a trial court's decision to terminate parental rights only when the evidence clearly mandates such a result in accordance with statutory standards. *Matter of Welfare of B.C.*, 356 N.W.2d 328, 330 (Minn.Ct.App.1984).

Termination of parental rights in this case was premised solely on Minn.Stat. § 260.221(b)(5) which states:

The juvenile court may, upon petition, terminate all rights of a parent to a child in the following cases:

* * * * * *

(5) That following upon a determination of neglect or dependency, reasonable efforts, under the direction of the court, have failed to correct the conditions leading to the determination * * *.

Therefore, termination on this statutory ground presupposes two conditions: (1) a determination of neglect or dependency; and (2) the existence of a rehabilitative case plan designed to correct conditions leading to dependency.

Appellant attacks the dependency determination because it was based on the erroneous conclusion that her illness was psychotic in origin. This argument is without merit. Minn.Stat. § 260.015, subd. 6(d) (1978), plainly allows a finding of dependency when a child is without proper care because of "the emotional, *mental* or physical *disability, or state of immaturity* of his parent * * *." (Emphasis supplied.) Since the statute does not differentiate between degrees of mental disability, it is

irrelevant whether the foundation of appellant's mental disease is organic or functional.

Appellant's argument on the second condition presents a much closer question. Specifically, appellant contends that she was never provided a written case plan as required under Minn.Stat. § 257.071, subd. 1 (1980). She argues that the failure to do so requires reversal of the termination order under our recent decision in *Matter of Welfare of Copus*, 356 N.W.2d 363 (Minn. Ct.App.1984). While we recognize the relevance of *Copus* to this issue, we believe that a final resolution depends in part on a similar analysis of *Matter of Welfare of R.M.M.*, 316 N.W.2d 538 (Minn.1982).

In *R.M.M.*, the mother had a long history of chemical and alcohol abuse and had attempted suicide five times over a period of ten years. She admitted abandoning her child and had requested termination of her parental rights on several occasions.

The trial court found that the mother's own lack of cooperation prevented the county from constructing and ultimately providing a written case plan. The supreme court affirmed stating that "while such a written plan is required in every case, * * * the absence of such a plan [under the facts] does not warrant reversal." *Id.* at 542.

In *Copus*, the father was a physically handicapped Vietnam veteran who had visited his children only seven times in two years but had corresponded over 100 times during the same period. He had contributed no financial support to the children and had a history of chemical dependency. This court reversed the termination order when the father did not receive a written case plan prior to termination of his parental rights. In so holding, this court distinguished *R.M.M.*:

> In *R.M.M.*, it was clear the mother would not be aided by a written case plan. Here the main problem is visitation, and a written case plan would provide appellant and his wife a clear indication of their rights, obligations, and the actions necessary to gain custody of appellant's children.

*Copus*, 356 N.W.2d at 367.

At first glance, appellant's suicidal tendencies and sporadic visitations appear to place this case within the confines of *R.M.M.* Several factors in this case, however, lend support to a *Copus* resolution.

First, the county here was able to formulate a case plan despite appellant's uncooperative nature at times. Second, appellant has never suggested that she desires termination of her parental rights. In fact, the opposite is true. Testimony adduced at trial indicated that retaining custody of her child is the major theme in appellant's life. Finally, appellant's caseworker had ample opportunity to provide her with a written plan or, in the alternative, verbally notify her of specific provisions. At trial the caseworker admitted that she could not recall ever discussing portions of the plan with appellant.

■ We think it is relevant that appellant suffered a form of mental illness closely akin to mild mental retardation. Under the circumstances, one of her caseworkers should have provided her with a written copy of the plan and explained the various conditions to her. Alternatively, appellant should have at least been verbally notified of the conditions in view of the detailed nature of the plan. We recognize that respondent employees made good faith efforts to assist appellant in meeting visitation schedules and in parenting the child. This effort alone, however, does not place this case within the *R.M.M.* exception. Appellant could not give her best effort to comply with the plan without a knowledge of those conditions.

Appellant further argues that the plan failed to include an expected date for return of the child and a notice of possible termination if the plan were not followed. We need not address these issues since we find reversal appropriate on other grounds.

■ The petitioner in a case for termination of parental rights has the burden of proving a statutory ground for termination

by clear and convincing evidence. *Matter of Welfare of Rosenbloom,* 266 N.W.2d 888, 889 (Minn.1978).

In *Copus,* this court stated that "[i]n the absence of [a] written case plan * * * clear and convincing evidence required to terminate a parent's right will rarely be present." *Copus,* 356 N.W.2d at 367. A review of the record draws us to this conclusion.

 Mental illness, in itself, cannot provide the foundation for a termination of parental rights. *Matter of Welfare of Kidd,* 261 N.W.2d 833, 835 (Minn.1978). This principle has recently been reaffirmed in *Matter of Welfare of P.J.K.,* 369 N.W.2d 286 (Minn. June 14, 1985).

 Here, there is no evidence of chemical or physical abuse as found in *Matter of Welfare of Michael Maas,* 355 N.W.2d 480 (Minn.Ct.App.1984). Moreover, there is no evidence of abandonment as in *R.M.M.,* 316 N.W.2d at 538. It is true that appellant's visitation was sporadic after November 1982, but this factor alone is insufficient to support a termination finding. *See Matter of Welfare of Solomon,* 291 N.W.2d 364 (Minn.1980).

 While evidence of abuse and abandonment need not be present in each case to justify termination of parental rights, we find the omission persuasive in this case. *See Matter of Welfare of White,* 363 N.W.2d 79 (Minn.Ct.App.1985). It is clear from the evidence that appellant's desire to regain custody of J.J.B. is a major theme in her life. Both Dr. Bonde and Dr. Heikens concluded that her suicide attempts were directly related to her frustration in achieving that goal. Even if appellant's prognosis for full recovery from her mental illness is poor, that fact alone does not address her ability to parent effectively.

Appellant's abuse has remained self-directed. On the only occasion she was allowed to care for the child in a home environment, her parenting abilities noticeably improved. The evidence presented did not clearly establish that she would be unable to do so for a prolonged, indefinite period.

 We are mindful that the best interests of the child must also be considered in a termination proceeding. *Matter of Welfare of H.G.B.,* 306 N.W.2d 821, 826 (Minn.1981). The interest of the parent and child must be balanced, but not necessarily equally weighed. *Matter of the Welfare of B.C.,* 356 N.W.2d at 332. Dr. Borreson testified to J.J.B.'s deteriorating relationship with appellant and her desire to remain with her foster parents. While this evidence addresses the issue of J.J.B.'s living environment, it does not overcome appellant's interest against termination. Termination of parental rights should not be ordered except for "grave and weighty reasons." *McDonald v. Copperud,* 295 Minn. 440, 444, 206 N.W.2d 551, 553 (1973).

We do not find here the "compelling circumstances," *Copus,* 356 N.W.2d at 367, which would justify termination of rights without the presentation to the parent of a written case plan.

### DECISION

The termination of appellant's parental rights was not justified. No written case plan nor verbal explanation of its contents was provided to her. Nor were there compelling circumstances justifying termination without the presentation of such a plan.

Reversed.