In the Matter of the WELFARE
OF J.M., J.M., and M.M.

No. C6–96–2365.

Supreme Court of Minnesota.

Jan. 28, 1998.

William McGee, Hennepin County Public Defender, Renee Bergeron,Assistant County Public Defender, Minneapolis, for Appellant.

Michael O. Freeman, Hennepin County Attorney, Andrew J. Mitchell, Assistant County Attorney, Minneapolis, for Respondent.

Michael J. Biglow, Minneapolis, for Guardian ad Litem.

## OPINION

BLATZ, Justice.

Almost three years ago, Hennepin County Department of Children and Family Services filed a petition to terminate appellant Frances Michaud's parental rights to her three youngest children: son J.M., daughter J.M., and son M.M. After several hearings and complex negotiations attempting to reunite the family, the juvenile court ordered from the bench that the children be placed in long-term foster care so that Michaud could continue to have supervised visits even though she was not capable of parenting them effectively. Hennepin County filed a motion for reconsideration, arguing that the statute governing permanent placement of children clearly prohibited placement of the Michaud children into long-term foster care. In response to the motion, the juvenile court issued a written order ruling that it had erred "by not properly considering the ages of the subject children each of whom was then under the age of seven years" and ordering that Michaud's parental rights be terminated. A divided panel of the court of appeals affirmed the juvenile court's decision.

On appeal, Michaud argues that her children's best interests in long-term foster care placement conflict with the statutory limitation on such placement and that therefore their best interests must prevail. She also contends that because the juvenile court failed to make specific findings on the children's adoptability, its factual findings were inadequate. We affirm.

Frances Michaud is the mother of son J.M., born on December 7, 1988; daughter J.M., born on April 2, 1990; and son M.M., born on September 16, 1991.[1] All three of the Michaud children have special needs. Hennepin County has been involved with Michaud and the children for more than six years. Son J.M. and daughter J.M. were adjudicated children in need of protection and services (CHIPS) under Minn.Stat. § 260.111 (1996) in September 1991 and placed in Hennepin County's custody due to Michaud's ongoing mental illness and chemical dependency. M.M. was adjudicated CHIPS in October 1992 for the same reasons. After Michaud remained sober and mentally stable for nine months, the juvenile court returned the children to her and dismissed the CHIPS petitions in July 1994. Five months later, in December 1994, Michaud was placed on a psychiatric hold after threatening to kill herself and the children. In January 1995, Hennepin County filed another CHIPS petition for all three children

---

1. Michaud is also the mother of two older children who are in long-term foster care and are not the subject of this termination proceeding.

and placed them in foster care. The children remain in foster care, the two sons in one home and the daughter in another.

In February 1995, Hennepin County filed a petition to terminate Michaud's parental rights under the termination statute, Minn. Stat. § 260.221 (1996). On the scheduled trial date in August 1995, the parties met and crafted a settlement that stayed the termination of Michaud's parental rights for two consecutive 90–day periods to give her the opportunity to comply with a detailed case plan and avoid termination. Michaud acknowledged on the record that her parental rights would be terminated if she failed to comply with any portion of her case plan. She also admitted that she had been diagnosed as dependent on cocaine and marijuana, that she had mental health problems, and that her chemical dependency and mental health problems had a "bad effect" on her ability to parent her children. The juvenile court accepted the settlement and ordered a review of Michaud's compliance with the plan at the end of each 90–day period. The juvenile court warned Michaud that if her parenting abilities and mental stability did not improve, her parental rights could be terminated despite full compliance with the case plan.

At a hearing after the first 90–day period, all parties agreed that Michaud had substantially complied with her case plan. At another hearing 45 days later, Hennepin County again acknowledged that Michaud remained in compliance with her case plan and asked the juvenile court to continue the matter for the remaining 45 days of the stay. The guardian ad litem, however, asked the juvenile court to revoke the stay and to terminate Michaud's parental rights. The guardian ad litem contended that despite Michaud's best efforts, she would not be able to parent her children outside Incarnation House, the highly structured transitional housing program in which she was living. The juvenile court continued the matter but asked the parties to submit proposed findings.

On February 14, 1996, Hennepin County reversed its earlier "wait-and-see" position and filed a motion to revoke the stay because Michaud had been terminated from Incarnation House and no longer had stable housing. At a contested hearing on June 4–5, 1996,

Michaud testified that she had been terminated from Incarnation House because she and another resident had altered a pop bottle to look like a crack pipe as a practical joke. She admitted that she had made a mistake in judgment, even though she had not used the bottle to smoke crack. Michaud testified that she was currently living with a friend, but if her children were returned to her, she would move with them into a shelter until they could find suitable housing. A staff worker from Incarnation House testified that Michaud was ready to take custody of her two sons but then Michaud sabotaged reunification when she was on the verge of success.

The Michaud children's child protection worker, James Lachowsky, testified extensively about Michaud's bond with her children and her ability to parent. He testified that although the children identified Michaud as their mother and look to her for approval, Michaud had only marginally improved in her ability to parent. He acknowledged that Michaud continued to comply with her case plan, including the requirement that she abstain from drug and alcohol use and continue with therapy. He also stated, though, that she refused to provide him with the address of where she was living. He concluded that she would not be able to parent her children effectively in the foreseeable future and that termination of her parental rights would thus be in her children's best interests. When asked about the Michaud children's prospects for adoption, Mr. Lachowsky stated, "there's no such thing as an unadoptable child." He admitted, however, that daughter J.M.'s special needs might make her difficult to adopt. He speculated that the most likely outcome was that the two boys would be adopted together, while the girl would have to be adopted separately.

The guardian ad litem, Patricia Barnacle, agreed with the child protection worker's conclusion that Michaud's parenting skills had not improved over time. Ms. Barnacle witnessed approximately 12 visits between Michaud and her children and testified about several incidents in which Michaud did not display appropriate responses or skills. Ms. Barnacle acknowledged that daughter J.M.'s

therapist had stated that it was in J.M.'s best interest to continue to have contact with Michaud. Nonetheless, Ms. Barnacle concluded that termination of Michaud's parental rights was in the best interests of all three children.

At the conclusion of the contested hearing, the juvenile court ruled from the bench that the children's best interests required placing them in long-term foster care. The juvenile court stated the parties had agreed that Michaud's parental rights would not be terminated as long as she complied with her case plan, and that the "joke" with the pop bottle did not affect the children and did not violate the "letter" of her case plan. The juvenile court found that Michaud would not be able to parent her children effectively in the foreseeable future, but determined that she should continue to have supervised visitation rights so long as she complied with her case plan. The juvenile court ordered that the Michaud children be placed into long-term foster care and that the juvenile court receive progress reports every six months. No written order was issued.

On June 12, 1996, Hennepin County filed a motion asking the juvenile court to reconsider its order for long-term foster care. At a hearing on July 25, 1996, Hennepin County argued that the juvenile court had no authority to place the three children in long-term foster care because the permanency statute, Minn.Stat. § 260.191, subd. 3b (1996), prohibits such placement of a child under age 12 unless the child would reside in that foster home with a sibling age 12 or over with whom that child has a significant positive relationship. Hennepin County also argued that the evidence before the juvenile court supported a determination that termination of parental rights and subsequent adoption served the best interests of each Michaud child. The guardian ad litem concurred with Hennepin County's motion. Michaud responded that the best interests of the child are the paramount concern in child protection cases and that the juvenile court had ordered long-term foster care based on the best interests of each child.

The juvenile court reversed its earlier ruling and terminated Michaud's parental rights in a written order dated October 23, 1996. In its order, the juvenile court declared that it had erred in its earlier order by failing to consider the age of the Michaud children, all of whom were under age seven at the time. It concluded that termination was justified because Michaud had failed to comply with the portion of her case plan requiring her to find safe, stable housing; she was palpably unfit to parent because of her chemical dependency and mental illness; and the Michaud children were neglected and in foster care. In support of its conclusions, the juvenile court made detailed factual findings, including that the best interests of each child were best served by termination of Michaud's parental rights and that Hennepin County had made "every reasonable effort to assist [Michaud] to rehabilitate herself as a parent and to reunite this family." Michaud appealed.

In a divided opinion, the court of appeals affirmed the decision of the juvenile court. The court of appeals noted that several of its earlier decisions had recognized a potential conflict between the permanency statute and a determination that long-term foster care serves the best interests of the child. In Michaud's case, however, the court of appeals concluded that she had shown no compelling evidence that long-term foster care was in fact in the best interests of the Michaud children, and thus the conflict did not arise. Moreover, the court of appeals held that the juvenile court's findings in support of its best interests analysis were supported by substantial evidence and were not clearly erroneous.

On appeal, Michaud argues that the best interests of her children require placing them in long-term foster care, and that their best interests trump the permanency statute's strict limitations on long-term foster care placement. She also contends that the juvenile court failed to make specific findings as to the children's adoptability and that therefore the factual findings were inadequate. Because we conclude that the permanency statute prohibits placement of the Michaud children into long-term foster care and that Michaud's parental rights were properly terminated, we affirm the decision of the court of appeals.

## I.

■ This case first requires us to determine whether the permanency statute, Minn. Stat. § 260.191, subd. 3b, permits the juvenile court to place Michaud's children in long-term foster care. The interpretation of a statute is a question of law, and thus we review it de novo. *Lolling v. Midwest Patrol*, 545 N.W.2d 372, 375 (Minn.1996). The object of statutory interpretation is to ascertain and effectuate legislative intent. Minn. Stat. § 645.16 (1996). We presume that plain and unambiguous statutory language manifests legislative intent. *See Lenz v. Coon Creek Watershed Dist.*, 278 Minn. 1, 9, 153 N.W.2d 209, 216 (1967). If statutory language is plain and unambiguous, the court must give it its plain meaning. *Phelps v. Commonwealth Land Title Ins. Co.*, 537 N.W.2d 271, 274 (Minn.1995). When the court construes a statute that contains both specific and general provisions, canons of statutory construction dictate that the specific provisions prevail over general provisions. *See* Minn.Stat. § 645.26 (1996); *Hyland Hill North Condominium Ass'n v. Hyland Hill Co.*, 549 N.W.2d 617, 622 (Minn.1996).

The permanency statute explicitly establishes that transfer of legal custody to a relative or termination of parental rights and adoption are the preferred permanency options for children who cannot return home. Minn.Stat. § 260.191, subd. 3b(a)(3). A child may not be placed in long-term foster care unless the court finds that neither an award of physical and legal custody to a relative nor termination of parental rights and adoption is in the child's best interests. *Id.* Underscoring its position that long-term foster care is a disfavored placement option, the legislature amended the permanency statute in 1994 to prohibit placement of a child under age 12 in long-term foster care unless the child meets two statutory criteria:

> [T]he court may only order long-term foster care for the child under this section if it finds the following:
>
> (i) the child has reached age 12 and reasonable efforts by the responsible social service agency have failed to locate an adoptive family for the child; or
>
> (ii) the child is a sibling of a child described in clause (i) and the siblings have a significant positive relationship and are ordered into the same long-term foster care home.

Act of May 6, 1994, ch. 598, § 7, 1994 Minn. Laws 1243, 1248 (codified at Minn.Stat. § 260.191, subd. 3b(a)). Even if a child meets the statutory criteria, long-term foster care remains a disfavored permanent placement option for *all* children. The permanency statute thus permits long-term foster care placement for children only after the juvenile court determines that placement with a relative or termination and adoption are not in the child's best interests and that the child meets the statutory criteria. *See* Minn.Stat. § 260.191, subd. 3b(a)(3). We find no ambiguity in these provisions.

The permanency statute also contains the general requirement that "[i]n ordering a permanent placement of a child, the court must be governed by the best interests of the child." Minn.Stat. § 260.191, subd. 3b(c). The statute governing termination of parental rights contains the same standard and states "the best interests of the child must be the paramount consideration." Minn.Stat. § 260.221, subd. 4. Michaud argues that in this case, her children's best interests in long-term foster care rather than in termination of her parental rights conflicts with the statutory limitation on long-term foster care placement and therefore their best interests must prevail. She relies on a recent court of appeals case that discussed what the court of appeals deemed a potential conflict between a child's best interests in a termination proceeding and the statutory prohibition on long-term foster care. *See In re Welfare of A.J.C.*, 556 N.W.2d 616, 620 n. 1 (Minn.App.1996), *pet. for rev. denied* (Minn. Mar. 18, 1997). In *In re A.J.C.*, the court of appeals affirmed the juvenile court's order for termination of parental rights but declared in dicta that "[i]t is evident that the limits stated in [the permanency statute] may conflict with compelling evidence in a termination case that long-term foster care serves the best interests of children." *Id.* In the Michaud case, the court of appeals referred to this alleged conflict but found that it was not present in the termination of Michaud's parental rights.

We reject the contention of both the court of appeals and Michaud that the best interests standard conflicts with the statutory limitations on long-term foster care. Their interpretation of the permanency statute does not comport with canons of statutory construction set forth by the legislature and utilized by this court. The permanency statute's specific prohibition against long-term foster care for children under age 12, except in very limited circumstances, is clear and unambiguous. According to the rules of statutory construction, this unambiguous and specific statutory provision must be read as an express limitation on the general requirement that all termination decisions be made in the best interests of the child. Indeed, as Michaud recognized in her brief and during oral argument, the legislature expressed in the permanency statute that long-term foster care is a highly disfavored disposition for children under age 12. The limitation on long-term placement in foster care represents a legislative determination that, except under very limited circumstances, long-term foster care is never in the best interests of a child under the age of 12. The best interests standard guides a court's determination in a termination proceeding, but it does not permit a court to order a statutorily-prohibited placement.

Michaud's argument appears based in part on the mistaken notion that once a parent's rights are terminated, the child may no longer have contact with the parent. It is true that when the state has met the heavy burden of showing that termination is in the child's best interests, the parent no longer has any legal right to have contact with the child. Minn.Stat. § 260.241 (1996). It is equally true, though, that the termination of a parent's rights is not to be construed as an absolute prohibition on contact between a child and a parent if a judge deems such contact to be in the best interests of the child, pending adoption.

Indeed, the legislature has not precluded any contacts that are in the child's best interests during the time between termination of parental rights and finalization of adoption. In fact, it recently enacted a statutory provision clarifying that the juvenile court shall retain jurisdiction over a case in which adoption is the desired permanency disposition.

Minn.Stat. § 260.241, subd. 3(b) (Supp.1997). This same provision requires that counsel for the child and the guardian ad litem continue on the case until an adoption decree is entered. *Id.* In addition, the new statute requires that the juvenile court hold a progress hearing on the case every 90 days after termination until adoption has occurred. *Id.* Together, these provisions give children's representatives ample opportunity to seek orders that are in children's best interests, including an order that permits contact between a child and a parent in the limited instance when the child needs to have contact and such contact would not be harmful.

When these statutes are read together, it is clear that the legislature has deliberately crafted laws that are child-centered. The laws as a whole prevent the desires or needs of a parent who has been adjudicated unfit or unable to meet the child's needs to dictate the existence or frequency of contact. While we recognize that this creates an emotionally wrenching situation for a parent, the legislature has insisted that the *child's* best interests are paramount. *See* Minn.Stat. §§ 260.011, subd. 2(b); 259.20, subd. 1(1); *see also* § 259.57, subd. 1 (1996).

■ Because we conclude that the restrictions on placement of children under 12 in long-term foster care are clear and unambiguous and do not conflict with the statutory best interests standard, we conclude that the juvenile court correctly refused to order the Michaud children into long-term foster care.

## II.

■ We next consider whether the termination statute, Minn.Stat. § 260.221, requires a juvenile court to make findings as to the adoptability of a child as part of its determination of the child's best interests. This too presents a question of law subject to de novo review. *See Lolling,* 545 N.W.2d at 375. Michaud argues that the juvenile court erred in failing to make adequate factual findings on the Michaud children's prospects for adoption as part of its analysis of whether termination was in their best interests. This argument assumes that the statute indeed requires such findings. The court of appeals held that "absent proof of impossibility of

adoption * * * this court must presume the adoptability of J.M., J.M., and M.M." *In re Welfare of J.M.,* No. C6–96–2365, 1997 WL 243475, at *3 (Minn.App. May 13, 1997).

■ The termination statute contains no provision requiring a juvenile court to assess the likelihood that a child will be adopted as part of its analysis of the child's best interests. *See* Minn.Stat. § 260.221. In 1985, we explicitly recognized that imminence of adoption was not a statutory requirement in a termination proceeding. *In re Welfare of P.J.K.,* 369 N.W.2d 286, 292 (Minn.1985). The court of appeals in *In re P.J.K.* had reversed the juvenile court's termination of parental rights in part because there was no evidence that adoption of the children was an immediate possibility. *Id.* We reversed the court of appeals, holding that "nowhere in the statute is imminent adoption an element of a termination proceeding. The court of appeals seems to have added a requirement not contemplated by the legislature." *Id.* We also noted that requiring proof of an imminent adoption before terminating parental rights "might well hinder the adoption process." *Id.*

Michaud, however, relies on several recent decisions by the court of appeals asserting that an evaluation of the best interests of the child in a termination proceeding requires an assessment of the child's prospects for adoption. *See In re Welfare of M.P.,* 542 N.W.2d 71, 76 (Minn.App.1996); *In re Welfare of A.J.C.,* 556 N.W.2d at 620; *In re Welfare of D.J.N.,* 568 N.W.2d 170, 177 (Minn.App. 1997). The court of appeals in *In re M.P.* attempted to distinguish our explicit holding in *In re P.J.K.*—that imminence of adoption was not a requirement in termination cases— by arguing that *In re P.J.K.* had been decided before this court announced that the child's best interests were the paramount consideration in termination proceedings and before the legislature amended the termination statute to include that language. 542 N.W.2d at 76, n. 4.; *see also In re J.J.B.,* 390 N.W.2d 274, 279 (Minn.1986) (holding that the best interests of the child are the paramount consideration in terminating parental rights); Act of April 14, 1988, ch. 514, § 8, 1988 Minn. Laws 402, 407.

■ Canons of statutory construction militate against reading into the statutory text a provision not already there. *See Wallace v. Commissioner of Taxation,* 289 Minn. 220, 229, 184 N.W.2d 588, 593–94 (1971). Moreover, our determination in *In re P.J.K.* that the termination statute does not require an imminent adoption remains valid. The court of appeals' contention in *In re M.P.,* that the elevation of the best-interests standard in both case law and statute makes *In re P.J.K.* no longer controlling, is unconvincing. Before this court adopted the best interests of the child standard as the paramount consideration in termination cases, the standard previously required balancing the interests of the parent and the child in determining whether to terminate parental rights. *In re J.J.B.,* 390 N.W.2d at 279. After we held in *In re J.J.B.* that the child's best interests are paramount, the legislature enacted legislation stating that in any termination proceeding, the best interests of the child are paramount. 1988 Minn. Laws ch. 514, § 8. Further, the legislature stated explicitly that when the interests of a parent and child conflict, the best interests of the child are paramount. *Id.* Elevating a child's best interests over the interests of a parent does not make proof of adoptability a more compelling consideration.

Weighty policy considerations raised by both parties also support a conclusion that the termination statute does not require findings on adoptability before parental rights can be terminated. Michaud argues that Hennepin County cannot simply assert that "there's no such thing as an unadoptable child" and must instead provide statistics on the probability that a child will be adopted. In contrast, Hennepin County correctly points out that Michaud's reliance on past statistics about adoption fails to recognize that both the federal and state governments have recently passed legislation designed to remove barriers to adopting children in foster care. *See, e.g.,* 42 U.S.C. §§ 5111–5115 (1996) (establishing programs and authorizing appropriations to eliminate barriers to adoption); Act of May 30, 1997, ch. 239, art. 6, § 9, 1997 Minn. Laws 2742, 2807 (codified as amended at Minn.Stat. § 259.41 (Supp. 1997)) (simplifying adoption study requirements for existing foster parents); 1997

Minn. Laws, ch. 239, art. 6, § 30 (codified at Minn.Stat. § 260.241, subd. 3(b)) (requiring a hearing on progress toward adoption every 90 days after termination of parental rights). While we acknowledge that no one can predict with complete accuracy if or when the Michaud children will be adopted, we also recognize the absolute certainty that if Michaud's parental rights are not terminated, the Michaud children will never be adopted. Because we hold that the termination statute does not require assessment of a child's adoptability, we conclude that the juvenile court did not err in failing to make such findings.

### III.

 Finally, we address Michaud's contention that the juvenile court's findings supporting its termination order were inadequate. This court gives deference to the juvenile court's decision to terminate parental rights, but it will closely inquire into the sufficiency of the evidence to determine whether it was clear and convincing. *In re Welfare of S.Z.*, 547 N.W.2d 886, 893 (Minn. 1996).

A thorough review of the record in this case reveals that the juvenile court relied on clear and convincing evidence in terminating Michaud's parental rights. As part of the settlement agreement in August 1995 staying the termination order, Michaud made adverse admissions on the record about her past behavior, and she conceded that other people's testimony would demonstrate she was an unfit parent. Nevertheless, the juvenile court gave her yet another opportunity to rehabilitate by staying the termination order, even though her children had been in and out of Hennepin County's custody since 1991.

During the hearing in June 1996 on Hennepin County's motion to revoke the stay, the juvenile court heard extensive testimony about Michaud's continued inability to parent her children effectively. In support of its termination order in October 1996, the juvenile court found that Michaud was "secretive" about her living arrangements and unwilling to disclose to her caseworker her exact whereabouts; as of June 1996, she was still unable to assume the responsibilities of parenthood with any of her three children; and Hennepin County had made every reasonable effort to assist Michaud and to reunite the family. The juvenile court ordered termination only after hearing extensive testimony. The Michaud family's child protection worker and the guardian ad litem testified in support of termination. Both individuals had observed Michaud's interaction with her children and believed that it was in each of the Michaud children's best interests to terminate Michaud's parental rights. After reviewing the record, we conclude that it clearly supports the juvenile court's findings of fact.

In summary, we hold that the permanency statute's restrictions on long-term foster care for children under 12 are clear and unambiguous and do not conflict with the statutory requirement that the child's best interests are paramount. We further hold that the termination statute does not require assessment of a child's adoptability as part of the analysis of the child's best interests, and that clear and convincing evidence supported the juvenile court's decision to terminate Michaud's parental rights. Accordingly, we affirm the decision of the court of appeals.

Affirmed.

TOMLJANOVICH, Justice (concurring specially).

I agree with the result reached in this case because I believe that termination of parental rights is in the best interest of the children. But I do not believe the statute should be read, nor do I believe the Legislature intended to foreclose best interest of the children as the primary consideration in determining their future.

The majority notes that the permanency statute requires "[i]n ordering a permanent placement of a child, the court must be governed by the best interests of the child." Minn.Stat. § 260.191, subd. 3b(c)(1996). The statute governing termination of parental rights states "the best interests of the child must be the paramount consideration." Minn.Stat. § 260.221, subd. 4 (1996). No function a judge performs is as important as the placement of children and the termination of parental rights. We cannot assume that a parent is unfit in every case where the

parent is unable to assume his or her parental duties within the time the majority opinion dictates. There may be no suitable relative to fill the gap. Because we are unable to anticipate all those problems, a rule that prohibits long-term foster care with no consideration for the best interests of the child may do terrible harm.

While predicting adoption with certainty may be impossible, surely it should be a factor a judge may consider when facing the stark choice of long-term foster care or termination of parental rights. How can it be in the best interest of a child to ignore the possibility of a future with no parent—with no family—however flawed we may believe them to be.

In my view the Legislature did not intend that the statute be interpreted to foreclose any option that would be in the best interest of the children.