*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0833**

In the Matter of the Welfare of the Children of:
L. J. H., B. R. J. and R. J. C., Parents

**Filed November 3, 2014
Affirmed
Smith, Judge**

Anoka County District Court
File Nos. 02-JV-13-1592, 02-JV-1593, 02-JV-14-71

Patricia A. Zenner, Zenner Law Office, Stillwater, Minnesota (for appellant L.J.H.)

Tony Palumbo, Anoka County Attorney, Kathryn M. Timm, Marcy S. Crain, Patricia M. Fair, Assistant County Attorneys, Anoka, Minnesota (for respondent Anoka County)

Kenneth J. Dee, Assistant Anoka County Public Defender, Anoka, Minnesota (for respondent B.A.J.)

Gretchen R. Severin, Munstenteiger & Severin, P.A., Anoka, Minnesota (for respondent R.J.C.)

Joseph D. VanThomme, Eckberg, Lammers, Briggs, Wolff & Vierling, PLLP, Stillwater, Minnesota (for respondent B.R.J.)

Stephanie Goodsell, Ramsey, Minnesota (respondent)

        Considered and decided by Ross, Presiding Judge; Schellhas, Judge; and Smith, Judge.

UNPUBLISHED OPINION

**SMITH**, Judge

We affirm the district court's judgment adjudicating appellant's children in need of protection or services because substantial evidence supports the district court's findings.

## FACTS

Appellant L.J.H. is the mother of three boys. B.R.J. is the father of the two older boys, and R.J.C. is the father of the youngest. Before August 2013, all three boys, B.A.J., B.S.J., and C.J.C., were living with appellant in Section 8 housing; however, they were removed from the housing because of allegations that R.J.C. was living with them. R.J.C. stayed with appellant sometimes, but would stay with friends at other times. After the removal, appellant and the boys became homeless, staying at various places until finding a shelter in October. During that time, appellant attempted to enroll B.A.J. in a school near a home where she was staying. Appellant decided, however, that the home was not suitable for her children, and they left before B.A.J. began attending. In early October, B.A.J. began attending his former school again, about one month after the start of the school year.

On October 17, 2013, while the oldest two boys were having dinner with their father, B.S.J. told his father that R.J.C. had grabbed him by the throat the preceding day. Afterward, their father reported the incident to law enforcement. The matter was investigated by law enforcement and a child-protection investigator. Appellant denied that the incident took place. The child-protection investigator determined that it was in

the two older boys' best interests to stay with their father during the investigation, and L.J.H. reluctantly agreed to the safety plan.

On November 15, 2013, the child-protection investigator filed a Child in Need of Protection or Services (CHIPS) petition. The petition alleged that the children were in need of protection or services because they were homeless, B.A.J. had missed one month of school, and R.J.C. had grabbed B.S.J. by the throat in anger. The petition also questioned appellant's decision-making and ability to care for the children. It noted that, with regard to his two older children, R.J.C. had previously had his parental rights involuntarily terminated because of his physical abuse and neglect of the children, his drug use, and his criminal behavior. Moreover, appellant insisted that B.A.J. lied about the October 16 incident in order to stay with his father.

At trial, B.A.J. testified that, on October 16, while he was getting ready to go to his father's, B.S.J. misbehaved while they were all outside. R.J.C. got angry and grabbed B.S.J. by the throat and told him to quit. In response, appellant told R.J.C. to stop. Afterward, appellant and R.J.C. took the two older boys to meet with their father. B.A.J. also testified that appellant called him later and asked him to tell his father and the investigators that he had lied. Appellant testified that she was merely asking him to tell the truth about the incident because she believed that he had lied.

R.J.C. and appellant testified that R.J.C. had not grabbed B.S.J.; rather, appellant had held her son's chin between her thumb and forefinger to get his attention because he was misbehaving. R.J.C. stated that B.A.J. was inside watching a movie at the time and did not see what happened.

3

Appellant testified that R.J.C. is good with her kids and she would like to repair her relationship with him. She maintained that B.A.J. lied because he wanted to live with his father, instead of living at the shelter. Appellant also testified that B.R.J. has a history of being abusive and threatening, causing her to have an antagonistic relationship with him, and that he is a frequent user of marijuana. Appellant further testified that, since the investigation started, a therapist diagnosed her with depression and anxiety, which she attributes to the child-protection matter. Although she was no longer seeing a therapist because she moved, she testified that she continued to search for one closer to her new home.

A social worker testified that R.J.C. has an "extensive criminal history" and a prior termination of parental rights. In addition, a social worker and the guardian ad litem both expressed concerns that, because appellant displayed a failure to protect her children because of her continued relationship with R.J.C., she would allow him to continue to be around her children and assist in parenting in the future.

On April 28, 2014, the district court adjudicated all three boys as CHIPS. It found clear and convincing evidence that the children were homeless while in appellant's physical custody, that B.A.J. had missed almost one month of school, and that R.J.C. grabbed B.S.J. by the throat. The district court explicitly found that B.A.J.'s testimony was more credible than appellant's or R.J.C.'s. Based on these factual findings, the district court concluded that B.S.J. was a victim of physical abuse and that B.A.J. and C.J.C. reside with or have resided with a victim of domestic abuse and reside with or have resided with a perpetrator of domestic abuse. The district court also concluded that

4

all three children were without necessary food, shelter, education or other required care because appellant was unable or unwilling to provide that care, were without proper parental care because of a disability or immaturity of appellant and were in an environment that was injurious or dangerous to the children or others. Accordingly, the district court ordered all three children placed under the protective supervision of Anoka County Social Services.

## DECISION

Appellant argues that the district court adjudicated her children in need of protection or services based upon insufficient factual findings. In order to adjudicate a child as CHIPS, a district court must conclude that at least one statutory basis in Minn. Stat. § 260C.007, subd. 6 (2012) exists and that the child "needs protection or services as a result." *See In re Welfare of Child of S.S.W.*, 767 N.W.2d 723, 732 (Minn. App. 2009). We review a CHIPS adjudication for a "sufficiency of the evidence to determine whether the evidence is clear and convincing." *Id.* at 733 (citing *In re Welfare of J.M.*, 574 N.W.2d 717, 724 (Minn. 1998)). "Considerable deference is due to the district court's decision because a district court is in a superior position to assess the credibility of witnesses." *In re Welfare of L.A.F.*, 554 N.W.2d 393, 396 (Minn. 1996).

Appellant argues that the children received required care, including shelter and education, because appellant secured a place for them to stay each night and that B.A.J.'s missed school was not attributable to her conduct. A child is in need of protection or services if the child "is without necessary food, clothing, shelter, education, or other

5

required care . . . because the child's parent . . . is unable or unwilling to provide that care." Minn. Stat. § 260C.007, subd. 6(3).

There is clear and convincing evidence in the record that appellant and her children were homeless, thus without shelter that was safe and stable. Appellant testified that the family became homeless after she was removed from section 8 housing. She also testified that the housing she moved into was a bad environment for the children, and she had to get them out. Eventually, the family had to sleep in L.J.H.'s car before finding temporary accommodations through B.A.J.'s school, followed by a stay at a church-operated shelter. While the record does not indicate that the family was forced to sleep outdoors at any given point, it is clear that appellant was at least temporarily unable to provide a stable, safe home for the children.

Furthermore, there is clear and convincing evidence in the record that appellant did not put B.A.J. in school until almost one month into the school year. In order to establish educational neglect, thereby justifying a removal of the children from the parent's home, there must be a "severe deprivation of education." *In re Welfare of T.K.*, 475 N.W.2d 88, 93 (Minn. App. 1991). A child's absences must be attributable to the parent to be educational neglect, *In re Welfare of B.A.B.*, 572 N.W.2d 776, 779 (Minn. App. 1998), but there is a statutory presumption that a child's absence is attributable to the parent. Minn. Stat. § 260C.163, subd. 11 (2012). In *B.A.B.*, twenty total absences, both excused for illness and unexcused, over the course of the school year was sufficient to adjudicate a child as CHIPS. 572 N.W.2d at 777, 779.

While the record demonstrates that appellant attempted to enroll her son in school before he returned to his prior school, appellant ultimately failed to ensure that her son was in school for nearly one month. Unlike in *B.A.B.*, the absences were not caused by illness. They were caused by the family's itinerant lifestyle while homeless. And they were not spread out over the course of a school year. Consecutively missing one month of school at the beginning of the school year constitutes a severe deprivation of education, thus the record supports the district court's conclusion. Because the district court properly adjudicated the children as CHIPS within the definition of Minn. Stat. § 260C.007, subd. 6(3), we do not reach the other challenged grounds.

Appellant also challenges whether reasonable efforts were made to reunite appellant with her older children and whether placement with their father is in their best interests. The district court "shall ensure that reasonable efforts . . . are made to prevent placement or to eliminate the need for removal and to reunite the child with the child's family at the earliest possible time." Minn. Stat. § 260.012(a) (2012).

First, appellant argues that reasonable efforts were not made for reunification because no case plan was filed, as required by Minn. Stat. § 260C.178, subd. 7 (2012). Section 260C.178, subdivision 7 provides deadlines for out-of-home placement plans prepared under Minn. Stat. § 260C.212 to be filed with the district court. Section 260C.212 requires an out-of-home placement plan whenever a child is placed in foster care, either by court order or voluntarily. L.J.H.'s children were not placed in foster care. Rather, the father of the two older boys assumed the day-to-day care as part of a safety plan devised by the child-protection investigator and agreed to by L.J.H. *See* Minn. Stat.

7

§ 260C.219(a)(1)-(2) (2012) (categorizing the assumption of day-to-day care by another parent separately from out-of-home placement).  Because the children were not placed in foster care, an out-of-home placement plan was not required.  Moreover, the social worker testified that she went over a case plan with L.J.H. and that L.J.H. was aware of the steps that were necessary for reunification.  L.J.H. testified that she did not remember discussing a case plan, although she performed some of its requirements.  L.J.H. completed a urinalysis test, attended parenting classes, and started individual therapy.  But she chose not to voluntarily comply with the case plan as a whole, waiting for the district court to order her to do so.  For example, she did not undergo a parenting assessment, sign a release for the social worker to talk to her therapist, or begin joint therapy with B.A.J.  Therefore, the district court's determination that the county made reasonable efforts to seek reunification is supported by substantial evidence.

Second, appellant argues that placement with B.R.J. is not in the two older children's best interests.  One of chief purposes of juvenile-protection proceedings is to act consistently with the best interests of the child.  Minn. Stat. § 260C.001, subd. 2(a) (2012).  The district court should "preserve and strengthen the child's family ties whenever possible and in the child's best interests."  *Id.*, subd. 2(b)(3) (2012).  In balancing the preservation of the parent-child relationship against the best interests of the child, the district court should consider "such things as a stable environment, health considerations and the child's preferences."  *In re Welfare of Children of K.S.F.*, 823 N.W.2d 656, 668 (Minn. App. 2012) (quotation omitted).

Appellant testified that B.R.J. was physically and verbally abusive during their relationship and is a marijuana user who gets angry when he is unable to use marijuana. Conversely, social workers and the guardian ad litem noted that the children said they feel safe in B.R.J.'s home, there are no signs of abuse, and all B.R.J.'s urinalysis tests have come back negative, except for the first one.

B.A.J. also expressed a preference to remain with his father, partially because his father's home is more stable than his mother's. His father has lived in the same home for an extended time, where the boys know other children in the neighborhood and their grandmother is nearby. Furthermore, B.A.J. has consistently attended school and caught up on his coursework while living with B.R.J. B.R.J. also enrolled B.S.J. in a Head Start program in which he is doing well. The record does not contain any evidence that B.R.J. has failed to comply with his case plan.

In contrast, one boy was grabbed by the throat and both were homeless while in L.J.H.'s care. Her decision to include R.J.C. in the children's environment, and her hope that he will continue to be a presence, poses a risk to the children's safety. The district court found that R.J.C. stayed with the family and was regularly around L.J.H.'s children. The district court also found B.A.J.'s testimony that R.J.C. grabbed his brother by the throat credible. Furthermore, R.J.C. has previously had his parental rights involuntarily terminated amid child-abuse allegations. Even so, appellant testified that she remains in contact with him and hopes to repair her relationship with him because he's good with her children. Therefore, there is clear and convincing evidence to support the district court's finding that it is in B.A.J. and B.S.J.'s best interests to remain with their father.

9

We therefore affirm the district court's CHIPS adjudication because it is supported by clear and convincing evidence.

**Affirmed.**