Leroy S. KABES, et al., Relators,

v.

Rolf MIDDLETON, Commissioner, Minnesota Department of Economic Security, Respondent,

Minneapolis Star and Tribune Company, Respondent,

and

Clayton GOINES, et al., Relators,

v.

Rolf MIDDLETON, Commissioner, Minnesota Department of Economic Security, Respondent,

Minneapolis Star and Tribune Company, Respondent.

Nos. 81–1012, 81–1013.

Supreme Court of Minnesota.

Aug. 31, 1982.

Sigal & Miller and Thomas G. Harrigan, Minneapolis, for Kabes and Goines.

Warren Spannaus, Atty. Gen., St. Paul, for Middleton.

Faegre & Benson, Dale E. Beihoffer and Susan Goodnature, Minneapolis, for Minneapolis Star and Tribune Co.

OTIS, Justice.

Leroy S. Kabes, et al., and Clayton Goines, et al., employees of the Minneapolis Star and Tribune Company, obtained writs

of certiorari to review two decisions of the Representative of the Commissioner, Department of Economic Security, rendered on September 3, 1981, determining that they were disqualified from the receipt of unemployment compensation benefits by application of Minn.Stat. § 268.09, subd. 3 (1980). We affirm both determinations.

On September 13, 1980, the Minneapolis-St. Paul Mailers Union Local No. 4 and the Newspaper Guild commenced a strike against the newspaper. That strike related only to compensation of the member employees and did not concern questions of health or safety. The strike lasted 26 days and terminated on October 9, 1980. None of the persons involved in these appeals were members of the striking union. Additionally, the record establishes that these benefit claimants did not strike and that the employer continued to publish its newspaper, in reduced volume, during the strike.

### 1. *Kabes.*

The employees in this appeal are all members of the Minneapolis Printing and Graphic Communications Union Local No. 20 which has a collective bargaining agreement with the employer, Minneapolis Star and Tribune. These employees are pressmen and paper handlers for the company. They do not deal directly with management of the newspaper but instead communicate through their foreman and a Chapel Chairman who represent the union membership.

On the morning of September 13, 1980, all but one of the pressmen and paper handlers scheduled to work that day reported prior to the commencement of the picketing by the striking union. Evidence contained in the record suggests that once picketing began, however, the employer's representatives were informed by representatives of the pressmen's union that that union's membership would be honoring the other's picket line.

While these employees were present and willing to perform their normal duties, confusion attended the commencement of the strike and management appears to have had difficulty in determining a method of dealing with the strike and the volume of papers it intended to publish. A variety of instructions were given to the shift foreman by the employer's operations director.

Finally, when union and managerial personnel were unable to agree upon a response to the strike, the employer's employee relations director met with the union president and other union representatives to renew its most recent request for a press run of 20,000 to 40,000 newspapers. The union personnel conferred and responded that they would be unable to guarantee the safety of the presses if a press run were made. The Tribune's representative assured union representatives that the Tribune would assume liability for the presses, but the union refused to make the requested run.

At approximately 10 a. m., the foreman was informed by his employer that when the pressmen had completed the work they were willing to perform, they could leave the premises for the day. The employees were paid for the remainder of the full shift and most of the employees left the premises at either 10 or 11:30 a. m.

Although members of this union were scheduled to report during the course of the strike, not one pressman or paper handler reported to work on the evening of September 13 or at any other scheduled shift during the strike. The record indicates that a number of paper handlers "called in sick" during the first week after the commencement of the strike. The Tribune continued to publish throughout the strike, using non-union and managerial personnel to perform the work normally done by these employees.

Claim petitions were filed on behalf of all 199 members of this union. A claims deputy determined that 196 of these member employees were disqualified from the receipt of benefits because they had "participated" in the strike by their failure to accept and perform customary and available work for their employer. This determination was reversed by the Appeal Tribunal which concluded that none of the 199 claimants was participating in the strike.

The employer took a further appeal to the Representative of the Commissioner who reversed that determination and concluded that the employees had participated and were thus disqualified.

■ The critical inquiry is whether the employer sustained its burden of establishing that the claimants "participated" in the strike and were therefore disqualified from the receipt of benefits. Minn.Stat. § 268.-09, subd. 3 (1980). The employer, to have satisfied this standard, must have shown that there was customary work available and that the employees failed or refused to perform it.

■ The substantial evidence contained in the record requires the conclusion that the employer sustained this burden. Mr. Richard Cooney, the paper's operations director, who had come up through the ranks as Chapel Chairman or shop steward, testified without contradiction that on September 13, 1980, six crews were scheduled to print the September 14 Sunday Tribune. When asked if the company ever directly contacts individual pressmen to tell them to come to work, he answered, "No, the Chapel Chairman makes all the contacts," and that all contacts are handled through the union.

It is undisputed that on September 13 Walter Christensen, who was president of Pressmen's Union No. 20, was the spokesman for the union membership. Cooney testified that Christensen was asked to run off 20,000 to 40,000 papers for sale in the lobby of the newspaper. The union preferred not to run them. Rollie LeFebre pursued the matter on behalf of the company and the union members then caucused. On their return they stated they would not run the presses. This decision was confirmed by Maynard Schommer, a member of the union's bargaining unit.

Equally significant is the admission of Kabes himself in his application to the Department of Economic Security for benefits. In response to the question of who told him not to return to work, he answered "Union Steward."

The record in this case not only makes it clear that the pressmen themselves were fully aware that the work was available to them, but also that the only reason they left their jobs and failed to return was because their steward directed them to decline the company's request to run the presses. Nevertheless, the claimants argue that the employer failed to communicate to them individually the fact that work was available. The statute requires no such communication once the employees have announced a decision not to perform their duties and to honor a picket line. Minn.Stat. § 268.09, subd. 3 (1980), provides in part as follows:

> *Labor Dispute.* An individual who has left or partially or totally lost his employment with an employer because of a strike or other labor dispute at the establishment in which he is or was employed shall be disqualified for benefits:
>
> (a) For each week during which the strike or labor dispute is in progress; or
>
> (b) For one week following the commencement of the strike or labor dispute if he is not participating in or directly interested in the strike or labor dispute.
>
> Participation includes the failure or refusal of an individual to accept and perform available and customary work at the establishment.

In rendering his decision the Representative of the Commissioner adopted reasoning which comports with the purpose of the statute. He found no authority for requiring the company to advise employees individually of the availability of work, stating:

> Furthermore, on the morning of September 13, 1980, the employer did in fact have work for the claimants to do, in that the employer told the president of the claimants' union that it wanted a press run of between 20,000 and 40,000 newspapers. After a brief caucus, the claimants' union president informed the employer that the employees did not wish to perform such work. In light of the foregoing, we fail to see why the employer should have been required to clarify this situation. The president of the union was the duly authorized agent for all of

190

the claimants, and we see no reason to believe that the employer did not rely upon his decision. Had any of the claimants individually thereafter indicated a willingness to work, then the employer would have been obliged to furnish work to that individual. However, the record shows that no claimant made any attempt to report for work thereafter, nor in any other way notify the employer that he or she was available for work. It should be borne in mind that the union steward did in fact confer with the pressmen themselves on September 13 before advising the company of their collective decision.

In addition, that portion of the Commissioner's determination, to the effect that to go through the motions of scheduling work for employees after they have unequivocally refused to continue on the job, would be a "charade", is equally persuasive.

Finally, as to the availability of "customary" work, it is undisputed that the number of pressmen and paper handlers here involved is 196 and the normal circulation of papers was about 385,000 a day. To print only 20,000 to 40,000 papers could quite obviously require the use of substantially fewer presses and fewer pressmen. Had all of the pressmen and mail handlers been willing to work, many of them would have been laid off as not needed. Under those circumstances presumably employees with least seniority would be entitled to unemployment benefits. But it is not enough to say that because some benefits would have been paid had all been willing to work, no benefits should be denied because all employees were unwilling to work. Jobs were available to those who sought them, in some undetermined numbers, and to the extent they continued to work, all employees would either have received salaries or benefits. The employer should not now be penalized because these claimants elected to honor another union's picket line and thereby "participated" in the labor dispute under the clear language of the statute.

## 2. Goines.

The employees in this matter are all members of the Service Employee International Union Local No. 26 which also operates pursuant to a collective bargaining agreement with the employer, Minneapolis Star and Tribune Company. These employees provide custodial services to the Tribune and perform work in accordance with a schedule provided to them by the employer well in advance of the time they are to report for work.

On the morning of the strike, six or seven of these custodial employees were scheduled to work, but only one reported at 7 a. m.; that employee left the plant at 10 a. m. for reasons irrelevant here. The following day, September 14, 1980, six of the custodial employees were again scheduled to work but none reported. The other employees involved in this appeal were scheduled to work at various times during the period of the strike but never reported.

There is no dispute but that during the strike, the employer closed designated entrances to the plant with the exception of the main entrance. None of these claimants reported to work to the main entrance during the course of the strike, although the record does indicate that several appeared to retrieve personal items from their lockers or to obtain money from the employee credit union. As a result, throughout the course of the strike, the work normally performed by the claimants was performed by nonunion and management personnel.

At the time of the hearing conducted by the Appeal Tribunal, a number of employees testified that they had attempted to determine whether work was available for them during the course of the strike and were informed by their supervisor, the building service superintendent, that no work was available and that they should not report because the company was not admitting union employees to the building. The Department of Economic Security eligibility forms of several of these employees state that certain individuals did not report because a strike was in progress despite the

fact that work was available; other forms indicated that individuals contended that work was unavailable because doors were locked or they had been informed by co-workers that they would not be admitted. The employer introduced testimony to the contrary.

The Appeal Tribunal and the Representative of the Commissioner both found that the employer had sustained its burden of establishing that the claimants were here disqualified from the receipt of benefits because customary work was available and they did not report to perform it. Minn. Stat. § 268.09, subd. 3 (1980).

It is our view that the record adequately and substantially supports the determination of the Representative of the Commissioner in this regard. The schedules for work of these claimants were prepared well in advance and a means of ingress and egress was provided by the employer so that these claimants might report to work and perform the tasks to which they were assigned. They chose not to do so.

Based upon the foregoing, the decision of the Representative of the Commissioner in the Goines matter is affirmed.

Affirmed.

YETKA, Justice (dissenting).

In the matter of the Kabes appeal, I would reverse.

On the morning of September 13, 1980, all but one of the pressmen and paper handlers scheduled to work that day reported prior to the commencement of the picketing by the striking union. Evidence contained in the record suggests that once picketing began, however, the employer's representatives were informed by representatives of the pressmen's union that that union membership would be honoring the other's picket line.

While these employees were present and willing to perform their normal duties, confusion attended the commencement of the strike and management appears to have had difficulty in determining a method of dealing with the strike and the volume of papers it intended to publish. A variety of instructions were given to the shift foreman by the employer's operations director.

Finally, when union and managerial personnel were unable to agree upon a response to the strike, the employer's employee relations director met with the union president and other union representatives to renew its most recent request for a press run of 20,000 to 40,000 newspapers. The union personnel conferred and responded that they would be unable to guaranty the safety of the presses if a press run were made. The Tribune's representative assured union representatives that the Tribune would assume liability for the presses, but the union refused to make the requested run.

At approximately 10:00 a. m., the foreman was informed by his employer that when the pressmen had completed the work they were willing to perform, they could leave the premises for the day. The employees were paid for the remainder of the full shift and most of the employees left the premises at either 10:00 or 11:30 a. m.

Although members of this union were scheduled to report during the course of the strike, not one pressman or paper handler reported to work on the evening of September 13 or at any other scheduled shift during the strike. The record indicates that a number of paper handlers "called in sick" during the first week after the commencement of the strike. The Tribune continued to publish throughout the strike, using non-union and managerial personnel to perform the work normally done by these employees.

Claim petitions were filed on behalf of all 199 members of this union. A claims deputy determined that 196 of these member employees were disqualified from the receipt of benefits because they had "participated" in the strike by their failure to accept and perform customary and available work for their employer. This determination was reversed by the Appeal Tribunal which concluded that none of the 199 claimants was participating in the strike.

The employer took a further appeal to the Representative of the Commissioner who reversed that determination and concluded that the employees had participated and were thus disqualified.

The critical inquiry is whether the employer sustained its burden of establishing that the claimants "participated" in the strike and were therefore disqualified from the receipt of benefits. Minn.Stat. § 268.-09, subd. 3 (1980). The employer, to have satisfied this standard, must have shown that there was customary work available and that the employees failed or refused to perform it.

The substantial evidence contained in the record requires the conclusion that the burden of proof was not sustained. The claimants here appeared for work as scheduled on the date the strike commenced and began to perform their assigned tasks. Any cessation in performance must be attributed to the contradictory orders these individuals received from the management and their union representatives, as well as to the ultimate management directive that they could all leave work well in advance of the formal end of their shift. These employees were not informed that they should report again as regularly scheduled and, in fact, with regard to certain pressmen, no advance work schedule had been prepared.

While the confusion which attended the strike in all likelihood disrupted the employer's orderly conduct of its newspaper operations, these individuals should not be denied benefits solely upon that basis and, instead, the employer failed to establish that it properly conveyed to the authorized individuals or the specific employees that their customary work was available to them and would be throughout the course of the strike.

SCOTT, Justice (dissenting).

I join in the dissent of Justice Yetka.

TODD, Justice (dissenting).

I join in the dissent of Justice Yetka.