Kenneth M. LOLLING, Respondent,

v.

MIDWEST PATROL, Respondent,

Commissioner of Economic Security,
Petitioner, Appellant.

No. C4–95–300.

Supreme Court of Minnesota.

March 22, 1996.

Jim Paciotti, Duluth, for appellant.

Mark R. Gleeman, St. Paul, for Midwest Patrol.

Kent E. Todd, St. Paul, for Commissioner of Economic Security.

## OPINION

STRINGER, Justice.

The Commissioner of Economic Security (commissioner) appeals from a decision of the court of appeals holding that under Minn. Stat. § 268.10, subd. 1(d) (1992), which requires an employer to raise a known issue of disqualification within seven days of the mailing of the notice of the employee's claim for benefits, the Department of Economic Security (department) lacks jurisdiction to consider an employer's late protest that a former employee is disqualified from receiving reemployment insurance benefits. Taking into consideration all the provisions of Minn.Stat. § 268.10 (1992 & Supp.1993), the legislative history of the statute, and the purpose of reemployment insurance benefits, we hold that the department has jurisdiction to consider a late protest filed by an employer if it is filed within 24 months of the claim. We conclude that the court of appeals erred in its interpretation of the statute and that the timeliness of the protest under subdivision 1(d) determines the employer's experience rating only and is not jurisdictional. Therefore, we reverse the court of appeals.

From March 1, 1993, through April 6, 1994, respondent Kenneth Lolling was employed by Midwest Patrol, providing security services in various capacities, both part-time and full-time, and received pay in the range of $4.70 to $11 per hour. His final position with Midwest Patrol was as an investigator for the U.S. Steel account on the Iron Range at a rate of $11 per hour.

On about March 31, 1994, U.S. Steel notified both Lolling and Midwest Patrol that it was canceling its contract with Midwest Patrol. Midwest Patrol also sent notice to Lolling informing him of the lost contract. On April 1, 1994, Lolling spoke with Midwest Patrol's regional manager, who asked Lolling to come to Midwest Patrol's regional office in Duluth, where Lolling was originally hired, to discuss job-related problems and other job assignments.

On April 6, 1994, Lolling spoke with his immediate supervisor and informed him that he considered himself unemployed. The supervisor told Lolling that he was not unem-

ployed as far as Midwest Patrol was concerned, and there was other work available to him, but it would be necessary for Lolling to come to Duluth to discuss reassignment. When Lolling stated that he wanted to take two weeks of vacation to look for another job, the supervisor responded that Lolling did not need to look for another job because he already had a job with Midwest Patrol. Lolling repeated that he would need two weeks of vacation and that after that he might be willing to "sit down" and discuss his job.

Later in the day, Lolling also spoke to the regional manager for Midwest Patrol, who emphasized that Lolling was not laid off and that there were other job assignments available, but that Lolling would have to go to Duluth to discuss them. There was also some discussion as to whether Lolling would need to go to Duluth to get his final paycheck and vacation pay. Lolling became angry and threatened the regional manager with legal action. Despite Midwest Patrol's several requests that Lolling go to Duluth to discuss other job assignments, Lolling refused. According to Midwest Patrol, other job assignments were available to Lolling, both full-time and part-time and paid from $8 to $9.50 per hour. Midwest Patrol maintains that Lolling was not assigned other work because he refused to go to Duluth to meet with Midwest Patrol's representatives. According to Lolling, however, no mention was ever made of other employment opportunities with Midwest Patrol after he was informed that the contract with U.S. Steel was lost. Instead, Lolling claims that he was told there was no work available and that all of the discussions about going to Duluth concerned returning equipment and picking up his final paycheck, not reassignment and other work.

Lolling filed a claim for reemployment insurance benefits with the department indicating a claim date of April 3, 1994. On April 8, 1994, the department mailed notification of Lolling's claim to Midwest Patrol, and also on that date, notified Lolling that a determination of qualification had been made by a department claims deputy. On April 18, 1994, the department received a response from Midwest Patrol dated April 14, 1994, stating, "[o]ur records reflect that Mr. Ken-neth Lolling is stil [sic] employed by Midwest Patrol."

On April 29, 1994, Midwest Patrol terminated Lolling and on July 29, 1994, filed a notice of separation with the department. Midwest Patrol claimed to the department that Lolling had been terminated because he failed, without good cause, to accept a suitable offer of reemployment and for misconduct. Lolling received a total of $3,254 in benefits; his last benefit check was dated July 15, 1994.

Over the next several months Lolling's claim was reviewed by a variety of tribunals with differing results. On September 1, 1994, the department issued a determination holding that Lolling was involuntarily separated from his employment on or about March 31, 1994, for reasons other than misconduct. That determination was not appealed. A department claims representative issued a second determination on September 8, 1994, however, disqualifying Lolling from receiving reemployment insurance benefits because on April 6, 1994, he failed, without good cause, to accept an offer of suitable reemployment from Midwest Patrol. Lolling filed a timely appeal from the determination. A department reemployment insurance judge conducted an evidentiary hearing and on November 1, 1994, reversed the department's determination, concluding that Lolling was not disqualified from receiving reemployment insurance benefits because no offer of work had been made to Lolling.

Midwest Patrol then filed a timely appeal to the commissioner. A representative of the commissioner reviewed the proceedings and reversed the department reemployment insurance judge's decision, finding the testimony of the employer's representatives more credible than the testimony of Lolling. The commissioner's representative determined that Lolling was disqualified from receiving reemployment insurance benefits because Lolling failed, without good cause, to apply for available suitable work and failed, without good cause, to accept an offer of suitable reemployment from Midwest Patrol. The decision noted that Midwest Patrol had on several occasions clearly informed Lolling that it had other job assignments for him,

but Lolling refused to go to Duluth to discuss reassignment and threatened Midwest Patrol with legal action. The commissioner's representative concluded that when an employee has clearly made it known that he does not want reemployment, "to require the employer to provide further specifics would have been a 'charade.'"

Lolling petitioned the court of appeals for a writ of certiorari and argued that under Minn.Stat. § 268.10, subd. 1(d) (1992), Midwest Patrol failed to file its claim of disqualification in a timely manner and therefore the department no longer had jurisdiction.[1] *Lolling v. Midwest Patrol*, 533 N.W.2d 632 (Minn.App.1995). The court of appeals agreed and reversed, holding that under Minn.Stat. § 268.10, the department does not have jurisdiction to consider an employer's late claim of disqualification. *Id.* at 636.

The construction of a statute is a question of law and therefore fully reviewable by an appellate court. *Hibbing Educ. Ass'n v. Public Employment Relations Bd.*, 369 N.W.2d 527, 529 (Minn.1985). While this court is not bound by an agency's conclusions of law, the manner in which an agency has construed a statute may be entitled to some weight when the statutory language is technical in nature and the agency's interpretation is one of longstanding application. *Arvig Tel. Co. v. Northwestern Bell Tel. Co.*, 270 N.W.2d 111, 114 (1978); *see also* Minn. Stat. § 645.16(8) (1994) (stating that the intention of the legislature may be ascertained by considering administrative interpretations of the statute). The party seeking review on appeal has the burden of proving that the agency has exceeded its statutory authority or jurisdiction. *Markwardt v. State Water Resources Bd.*, 254 N.W.2d 371, 374 (Minn. 1977).

Determining whether the commissioner had jurisdiction to consider an employer's late claim of disqualification involves the interpretation of statutory provisions, which,

on their face, seem to conflict. Minn.Stat. § 268.10, subd. 1(d) (1992) provides in relevant part:

> The employer so notified [of a claim for reemployment insurance benefits] *shall have seven days* after the mailing of the notice to file a protest to monetary entitlement or a protest raising an issue of ineligibility or disqualification.

(Emphasis added.) In comparison, Minn. Stat. § 268.10, subd. 2(2) (Supp.1993) provides in relevant part:

> *At any time within 24 months* from the date of the filing of a valid claim for benefits by an individual, an official of the department or any interested party or parties[2] raises an issue of claimant's eligibility for benefits for any week or weeks in accordance with the requirements of the provisions of sections 268.03 to 268.231 or any official of the department or any interested party or parties or benefit year employer raises an issue of disqualification in accordance with the rules of the commissioner, a determination shall be made * * *.

(Emphasis added.)

The court of appeals, noting the apparent conflict between the 7–day limit in subdivision 1(d) for raising an issue of ineligibility or disqualification and the 24–month deadline in subdivision 2(2) for raising an issue of eligibility, concluded that "the legislature could not have intended to allow employers to completely ignore the 7–day limit in subdivision 1(d) and raise issues of disqualification at their leisure any time within the next 24 months * * *." *Lolling*, 533 N.W.2d at 636. The court of appeals found that the 24–month period for raising disqualification was intended for disqualifying actions that occur after the determination of validity and receipt of benefits—not for the situation here, where the employer knew of the claim of

---

1. The timeliness of Midwest Patrol's protest had not been an issue before this case reached the court of appeals because the department had a longstanding practice of considering late reports and protests made by employers based on the department's interpretation of Minn.Stat. § 268.10.

2. "Interested party" is defined to include the most recent employer prior to the filing of a valid claim for benefits. Minn.Stat. § 268.04, subd. 18 (1994).

disqualification when the initial notice was filed. *Id.*

According to the court of appeals, the department did not have jurisdiction over the disqualification issue in this case because Midwest Patrol did not file its claim of disqualification in a timely manner. The court of appeals concluded that Midwest Patrol had seven days under Minn.Stat. § 268.10, subd. 1(d), to raise a known issue of disqualification and that the failure of Midwest Patrol to raise disqualification at that time meant that the issue could not be raised later, even under Minn.Stat. § 268.10, subd. 2(2).[3] *Id.*

■ The commissioner, on the other hand, has interpreted Minn.Stat. § 268.10, subd. 2(2), as giving the department jurisdiction to consider an issue of disqualification raised by the employer more than seven days after mailing of the notice of the claim if it is filed by the employer within 24 months of the date of the claim. We conclude that this is the appropriate application of the statute for several reasons: first, there is no language in section 268.10 that prohibits the department from considering a late protest, and in fact subdivision 1(f) specifically addresses late reports and protests:

> The commissioner shall determine any issue raised under paragraph (d) *or by an employer's late report.* * * * [A]ny relief from benefit charges provided by section 268.09, subdivision 1, paragraph (e), shall apply to weeks of unemployment beginning *after the filing of the late report or protest.*

Minn.Stat. § 268.10, subd. 1(f) (1992) (emphasis added). As we view the statutory framework, the 7–day limit for filing a protest in subdivision 1(d) impacts the employer's experience rating, penalizing an employer for filing a protest after the 7–day limit by increasing its tax rate. To view it as a jurisdictional time frame, as Lolling urges, would render subdivision 1(f) meaningless because if the department has no jurisdiction

to consider a late protest, there obviously would be no reason for providing relief from benefit charges after the filing of a late protest.

Second, the Minnesota Legislature amended Minn.Stat. § 268.10 in 1982, removing language that expressly prohibited the commissioner from considering a claim of disqualification raised after the 7–day limit and adding the language currently in subdivision 1(f) requiring the commissioner to determine any issue of disqualification raised by an employer's late report. Act of March 30, 1982, ch. 1, § 29, 1982 Minn.Laws 1639, 1665–67. It seems clear that the legislative purpose in making these changes was to allow the department to determine any issue of disqualification raised by an employer's protest, even if filed after the 7–day time limit.[4]

■ Finally, the legislative purpose of reemployment insurance benefits further supports this interpretation of Minn.Stat. § 268.10. Reemployment insurance benefits are considered to be state funds, *Jackson v. Minneapolis–Honeywell Regulator Co.*, 234 Minn. 52, 55, 47 N.W.2d 449, 451 (1951), and courts, in ascertaining the intention of the legislature, presume that "[t]he legislature intends to favor the public interest as against any private interest." Minn.Stat. § 645.17(5) (1994). To conclude that the 7–day time frame in subdivision 1(b) is jurisdictional has the effect of triggering the expenditure of public funds by reason of dilatory action on the part of an employer. *See* Minn.Stat. § 268.03 (1994) (declaring public policy). Accordingly, taking into account all the provisions of section 268.10, the legislative history of the statute, and the public purpose of reemployment insurance benefits, we conclude that the department has jurisdiction to consider an untimely protest made by an employer if it is filed within 24 months of the claim.

---

3. Midwest Patrol claims that it filed a timely protest within seven days. Because of our disposition of this case, we need not decide whether the protest was timely.

4. We note that since the enactment of these statutory changes in 1982, in thousands of cases the commissioner has consistently interpreted

the provisions of Minn.Stat. § 268.10 as requiring the department to determine any issue of possible disqualification raised within 24 months of the date of the claim, considering the 7–day limit in subdivision 1(d) as relating only to a determination of when a protest becomes late filed for purposes of the employer's tax rate.

Next, we consider the determination of the commissioner's representative that Lolling is disqualified from receiving reemployment insurance benefits because he failed, without good cause, to apply for suitable work and to accept an offer of suitable reemployment from Midwest Patrol. An appellate court reviews "the findings of the commissioner or the commissioner's representative, not those of the referee, even though those findings might involve witness credibility." *Tuff v. Knitcraft Corp.*, 526 N.W.2d 50, 51 (Minn.1995) (citing *Semanko v. Department of Employment* Servs., 309 Minn. 425, 428, 244 N.W.2d 663, 665 (1976)). We review the factual findings of the commissioner's representative in the light most favorable to the decision and determine whether there is evidence in the record that reasonably tends to sustain those findings. *Ress v. Abbott Northwestern Hosp., Inc.*, 448 N.W.2d 519, 523 (Minn.1989). The ultimate determination of whether an employee was properly disqualified from receiving reemployment insurance benefits, however, is a question of law upon which this court remains "free to exercise its independent judgment." *Id.*

The commissioner's representative found the testimony of Midwest Patrol's representatives more credible than the testimony of Lolling and concluded that Lolling was disqualified from receiving benefits because he failed, without good cause, to apply for available suitable work. *See* Minn.Stat. § 268.09, subd. 2 (1994). Representatives of Midwest Patrol testified that they stressed in their conversations with Lolling that he was not unemployed and that there were other job assignments available for him. There is sufficient evidence in the record to conclude that Midwest Patrol advised Lolling of other positions that were available, but Lolling refused to go to Duluth to discuss them, thereby disqualifying him from receiving reemployment insurance benefits because of his failure to apply for available suitable work.

The commissioner's representative also determined that Lolling was disqualified from receiving reemployment insurance benefits because of his failure, without good cause, to accept an offer of suitable reemployment from Midwest Patrol. *See id.* Although specific job assignments were not discussed with Lolling, Midwest Patrol claims that it did not have an opportunity to discuss specific assignments because "[i]mmediately into the conversation, Mr. Lolling made threats about legal action" and further refused to go to Duluth to discuss specific positions that were available. We have held that an employer need not go through the "charade" of detailing all the terms and conditions of an offer that the employer has every reason to believe will be rejected by the employee. *Kabes v. Middleton*, 324 N.W.2d 187, 190 (Minn.1982) (holding that an employer does not have to communicate to employees individually that work was available once employees have announced a decision not to perform their duties); *Fielding v. George A. Hormel Co.*, 439 N.W.2d 12, 17 (Minn.1989) (Coyne, J., concurring specially) (concluding that a general recall letter sent to striking employees that "is nonspecific about particular job openings, their number, and the exact dates on which particular positions will be available casts no doubts on the bona fides of the job offer"). Therefore, we conclude that Midwest Patrol made a suitable offer of reemployment to Lolling and that his failure to learn of the details or specifics of the offer were due to his own conduct.

Accordingly, we reverse the court of appeals and conclude that the department had jurisdiction to consider Midwest Patrol's protest that Lolling was disqualified from receiving reemployment insurance benefits because it was filed within 24 months of the claim and Lolling was properly disqualified from receiving reemployment insurance benefits.

Reversed.