**STATE of Minnesota, Respondent,**

v.

**Gerald James GREENFIELD, Appellant.**

No. C7–00–811.

Court of Appeals of Minnesota.

Feb. 20, 2001.

Ronald I. Meshbesher, Jonathan M. Peck, Meshbesher & Spence, Ltd., Minneapolis, MN, (for appellant).

Mike Hatch, Attorney General, James B. Early, Assistant Attorney General, St. Paul, MN; and Amy Klobuchar, Hennepin County Attorney, Minneapolis, MN, (for respondent).

Considered and decided by
KALITOWSKI, Presiding Judge,
RANDALL, Judge, and CRIPPEN,
Judge.

## OPINION

R.A. RANDALL, Judge

Appellant Gerald J. Greenfield appeals his conviction for felony sports bookmaking, arguing that the evidence is insufficient to prove that he accepted a bet, as statutorily defined, because he did not stand to gain or lose anything by the transactions and did not charge the caller for more than the amount of the wager. Appellant also argues that the district court erred in allowing the state to introduce into evidence a false identity card seized from appellant's home when appellant offered to stipulate to identity. We affirm.

## FACTS

Appellant was charged with felony sports bookmaking in violation of Minn. Stat. § 609.76, subd. 2 (1994). Following a jury trial, Greenfield was found guilty of felony sports bookmaking; gross misdemeanor receiving, recording or forwarding a bet; and misdemeanor making a bet. Greenfield filed a motion for judgment of acquittal or for a new trial. The district court denied Greenfield's motion, entered judgment, and sentenced him for felony sports bookmaking.

In April 1996, the Minnesota Department of Safety's Alcohol and Gambling Enforcement Division (the Department) was contacted by the New York State Police with information acquired through legal wiretaps and pen registers regarding an illegal bookmaking operation in New York connected to Minnesota. New York provided the Department with two Minnesota phone numbers and copies of the Minnesota conversations from their investigation.

Investigation of the Minnesota phone numbers revealed Greenfield set up an elaborate phone system using landlines and cell phones registered to two different addresses of adjoining townhouses. Greenfield owned one townhouse, and the other townhouse, although actually owned by a couple who lived out of state during the winter, had a post office box registered to that address by a J.P. Field for purposes of setting up a cell phone. Surveillance of the two properties revealed a high probability that Greenfield and J.P. Field was the same person.

Investigators executed a search warrant for Greenfield's townhouse. They noticed, before entering, Greenfield sitting at a desk where they later found betting

sheets, a cellular phone directory, phone bills for J.P. Field, a cellular phone registered to J.P. Field, tout service books, and various other items commonly used in gambling. In a floor safe in Greenfield's bedroom closet, police found approximately $87,000 cash in marked envelopes, an envelope with J.P. Field written on it, and two I 94 identification cards under the name of John Patrick Field with Greenfield's picture. Possession of false I 94 identification cards is not illegal.

The cellular phone directory contained coded names and numbers that coincided with column headings on the betting sheets. The initials MA and the corresponding coded phone number in the phone directory coincided with Melvin Amiel's New York phone number. Amiel was the subject of the New York investigation. Further, the recorded conversations between Amiel and Greenfield corresponded closely with the data in the column marked MA on the betting sheets. The March 31, 1996, betting sheet showed that Greenfield received $18,300 in wagers, "passed off" a bet of $10,000 to a bookie in Ohio, and retained $8,300 for himself.

## ISSUES

1. Was there sufficient evidence to sustain appellant's conviction?

2. Did the district court err in admitting the false identification cards into evidence?

## ANALYSIS

### I. Sufficient Evidence

In considering a claim of insufficiency of the evidence, this court's review is limited to a painstaking analysis of the record to determine whether the evidence, when viewed in the light most favorable to the conviction, is sufficient to allow a jury to reach its verdict. *State v. Webb,* 440 N.W.2d 426, 430 (Minn.1989). The reviewing court must assume the jury believed the state's witnesses and disbelieved any evidence to the contrary. *State v. Moore,*

438 N.W.2d 101, 108 (Minn.1989). The reviewing court will not disturb the jury's verdict, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, the jury could reasonably conclude the defendant was guilty of the charged offense. *State v. Alton,* 432 N.W.2d 754, 756 (Minn. 1988).

Greenfield argues the evidence was legally insufficient to support his conviction for sports bookmaking, and therefore he is entitled to have his conviction vacated. He argues that he did not actually participate in any bets, except on one occasion, but was rather a "beard," which falls outside the scope of the sports bookmaking statute. A beard is someone who places wagers for other individuals without revealing the true identity of the person responsible for the wager.

Greenfield focuses his argument on what constitutes a bet, and stresses that to have betting, which is part of the statutory language for sports bookmaking, there must be self-defeating wagers. He claims he never stood to gain or lose anything from the bets placed on behalf of others. He argues that passing bets on behalf of other bettors as a beard does not constitute bookmaking. Greenfield asserts he cannot be both a beard and a bookie. Greenfield concedes that the taped telephone conversations appear to show Amiel placing bets with Greenfield; however, he argues that careful analysis of the contents of the conversations in conjunction with inspection of the betting sheets demonstrates that he had no risk of loss with Amiel.

The interpretation of a statute is a question of law, and thus this court reviews it de novo. *Lolling v. Midwest Patrol,* 545 N.W.2d 372, 375 (Minn.1996). The purpose of statutory interpretation is to ascertain the effective legislative intent. Minn.Stat. § 645.16 (2000). If statutory language is plain and unambiguous, the court must give it its plain meaning. *Tuma v. Commissioner of Econ. Sec.,* 386

N.W.2d 702, 706 (Minn.1986). The rule of strict construction of criminal statutes guards against creating additional criminal offenses not intended by the legislature to be part of the statute. *State v. Soto,* 378 N.W.2d 625, 628 (Minn.1985).

■ Sports bookmaking is defined as the activity of intentionally *receiving, recording or forwarding* within any 30–day period more than five *bets,* or *offers to bet,* that total more than $2,500 on any one or more sporting events.

Minn.Stat. § 609.75, subd. 7 (1994) (emphasis added). A "bet" or "offer to bet" is part of an element of sports bookmaking; therefore, the meaning of a bet is at issue. A "bet" under Minn.Stat. § 609.75, subd. 2, is

a bargain whereby the parties mutually agree to a gain or loss by one to the other of specified money, property or benefit dependent upon chance although the chance is accompanied by some element of skill.

Greenfield argues that the definition for "bet" states that a gain or loss is experienced by one of the parties by mutual agreement. But "forwarding" a bet, by definition, means that someone else, even if not the forwarder himself, will have a gain or a loss. Greenfield argues that there is nothing in the record to prove he took "vigorish" or "vig," the bettor's/bookie's term for a fee to bet that is often paid by the loser in a sports bookmaking situation, over and above the amount of the wager. There is, however, nothing in the definition of a bet or sports bookmaking requiring a showing of the bettor's fee, or vigorish, to constitute a bet within the meaning of bookmaking.

■ Applying the plain meaning of a bet to the facts of this case, the people in the telephone conversations with Greenfield and on the betting sheets stood to lose money they placed on various sports games through Greenfield. If the bettor were to lose the bet, he would lose his money either to Greenfield or the person to whom Greenfield forwarded the bet for final determination (final determination simply meaning the ultimate person who accepted the bet, and, thus, stood to collect if the bettor lost or had to pay up if the bettor won). In every instance, either Greenfield or a bookie down the road would gain money or lose money.

It is apparent from the definition of sports bookmaking that the intent of the statute is to encompass a broad range of transactions dealing with bets. Sports bookmaking does contain the word "bet"; however, the definition of sports bookmaking also includes "receiving, recording, or forwarding" a bet or an offer to bet. Thus, anyone receiving, recording, or forwarding a bet or offer to bet can be convicted of sports bookmaking under the statute (assuming the other elements are present; i.e., 30 day period, six or more bets or offers to bet, $2,501 total or more) whether they choose to call themselves a bookie, a beard, or just a bettor. The offense of forwarding bets would have no teeth and the statute would be worthless for that activity if a complete defense was, as Greenfield argues, that he merely bet for someone else and personally did not stand to gain or lose. A beard, even one claiming that he does not stand to gain or lose anything from the deal, acts as an intermediary by forwarding the bet to a bookmaker. The language of the statute shows the legislature intended that statute to cover transactions involving persons who receive, record, or forward bets.

Greenfield conceded that he was at least a beard. In addition, he agreed that if MA won a bet Greenfield placed as a beard, MA would look to Greenfield for his winnings, and if MA lost, Greenfield would receive the lost bet from MA and forward it to the person with whom Greenfield placed the bet. On March 31, 1996, Greenfield forwarded $10,000 to a bookmaker in Ohio. Whether this was laying off bets as a bookie or placing the bet as a beard so that another bettor could remain anonymous, both come under the statute.

Both transactions are acts of forwarding. The recorded telephone conversations between Amiel and Greenfield establish that Greenfield committed an offense outlined in sports bookmaking. The record bolsters this conclusion. He had tout service books; coded names and phone numbers, a common practice in gambling for bookies; dozens of betting sheets; $87,000 cash, along with false identification cards and an envelope marked for J.P. Field in a floor safe; and phone records and bills for both Greenfield and J.P. Field. In addition, the record shows Greenfield took complicated steps to set up a post office box so he could register a cell phone to J.P. Field in order to conceal his operation.

█ Reading the definition of sports bookmaking in Minn.Stat. § 608.75, subd. 7, and giving it a plain meaning, sports bookmaking includes the actions of beards, bookies, and bettors involving both bets and offers to bet, providing all other essential elements of the statute have been established by proof beyond a reasonable doubt. Viewing the evidence in the light most favorable to the state, we conclude the evidence sufficiently supported Greenfield's conviction of felony sports bookmaking.

## II. Admissibility of Evidence

Greenfield argues, under Minn.R.Evid. 403 and 404(b), that the district court committed prejudicial error by admitting the false identification cards into evidence. Greenfield was willing to stipulate that he and J.P. Field was the same person, arguing that the false identification cards would imply other wrongdoing and unfairly prejudice Greenfield if admitted into evidence. He asks that this court reverse his conviction and remand for a new trial without introduction of the false identification cards.

█ We understand appellant's argument that defendants and defense counsel have the right to offer to stipulate to certain facets of the state's case for the pur-

pose of admitting the obvious and holding down unwarranted prejudicial overtones. But a defendant's offer to stipulate does not always take away the state's right to offer evidence on the point. *State. v. Davidson*, 351 N.W.2d 8, 10 (Minn.1984); *see also Old Chief v. United States*, 519 U.S. 172, 186–87, 117 S.Ct. 644, 653, 136 L.Ed.2d 574 (1997) (recognizing criminal defendant may not stipulate his way out of full evidentiary force of case as Government chooses to present it). In assessing the potential prejudicial impact of admitting stipulated evidence, the court must also look at the relevance of the stipulated evidence to additional issues that would be addressed by admitting the evidence. *Davidson*, 351 N.W.2d at 11–12.

Stipulations are mainly allowed when criminal status is an element of the crime at issue. *See State v. Clark*, 375 N.W.2d 59, 62 (Minn.App.1985) (holding aggravated DWI defendant should be allowed to stipulate prior DWI conviction and driver's license revocation, which are elements of aggravated DWI); *see also State v. Allen*, 375 N.W.2d 82, 85 (Minn.App.1985) (reversing decision where district court refused to accept defendant's offer to stipulate to felony status where status was element of charged crime), *review denied* (Minn. Dec. 19, 1985). *Old Chief* states that the "holding is limited to cases involving proof of felon status." 519 U.S. at 183, n. 7, 117 S.Ct. at 651, n. 7. This case is distinguishable on that point. Greenfield had no prior felony conviction. Allowing the false identification cards into evidence does not show criminal activity above and beyond the crime of sports bookmaking. Further, courts have not allowed stipulations by defendants in nonstatus cases where the state successfully argued to the court that they needed the evidence to go to the jury as part of the state's chain of proof that defendant committed the crime at issue. *See State v. Durfee*, 322 N.W.2d 778, 786 (Minn.1982) (affirming district court's decision to admit photographs, despite defendant's offer to stipulate that victim suffered great bodily harm, because

photographs were relevant on issue of whether defendant intentionally caused harm).

Greenfield, in trying to show why this evidence was prejudicial, draws analogies to cases involving admitting evidence of prior bad acts, such as a felon charged with possession of a weapon. Greenfield borrows the reasoning from *Davidson* and *Old Chief*, both dealing with a felon in possession of a weapon, to argue that introduction of the false identification cards implies criminal activity above and beyond the crime that is charged. Greenfield argues that granting the stipulation in his case would have been the correct ruling, as was stipulating felony status in the cases of *Davidson* and *Old Chief*. Finally, Greenfield asserts that the false identification cards created a substantial risk that the jury convicted Greenfield "based not on the relevant evidence in the record, but rather on [Greenfield's] perceived bad character," inferred from his possessing the false identification cards.

 The State offered the false identification cards for two purposes: first, to show that Greenfield and J.P. Field was the same person; and second, to use as part of its chain of proof to show the extent to which Greenfield used the false identification cards to conceal his operation. If the parties had agreed to the stipulation that J.P. Field was Greenfield and the identity cards were not admitted, the state would not have been able to show that the false identity cards were an integral part of Greenfield's efforts to obtain telephone service used for the sole purpose of the bookmaking operation.

 The false identification cards show that Greenfield created a false identity and that he did it in order to apply for a post office box so he could register for a cell phone and regular phone line to use in his bookmaking operation. The identification cards were part of the sequence of steps Greenfield took to conceal his operation. Because the false identification cards were part of Greenfield's concealment of identity, it could be inferred by a jury that, from their use, in combination with the other evidence, Greenfield had the intent to and did receive, record, or forward bets or offers to bet. We cannot conclude that the district court erred in admitting the false identification cards.

## DECISION

There was sufficient evidence to sustain appellant's conviction under the sports bookmaking statute. The district court did not err in admitting the false identification card into evidence.

**Affirmed.**