Sandra D. MADSEN, Relator,

v.

ADAM CORPORATION, Respondent,

COMMISSIONER OF ECONOMIC SECURITY, Respondent.

No. C9-01-2246.

Court of Appeals of Minnesota.

July 2, 2002.

Sandra D. Madsen, Waseca, MN, pro se relator.

Adam Corporation, Waseca, MN, respondent.

Philip B. Byrne, St. Paul, MN, for respondent commissioner.

Considered and decided by RANDALL, Presiding Judge, STONEBURNER, Judge, and HUSPENI, Judge.

## OPINION

HUSPENI, Judge.*

Relator seeks reversal of the decision of the Department of Economic Security that relator voluntarily quit her employment. She contends that because a medical condition prevented her from standing for her entire shift, and because she discussed that condition with her supervisor and sought to change to a job within the company that did not require constant standing, the medical necessity exception contained in Minn.Stat. § 268.095, subd. 1(7) (2000), applies and she is entitled to unemployment benefits. We agree that the medical exception set forth in the statute has been met, and we reverse.

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to

## FACTS

Relator Sandra D. Madsen worked at respondent Adam Corporation, a printing company, from the fall of 1997 to June 1, 2001. At the time of the termination of her employment, she worked full-time in the pressroom. Her job required her to stand for her entire shift, and she suffered from varicose veins.

On April 24, 2001, Madsen's personal physician told her she was a candidate for surgery to correct her varicose veins. Her physician also recommended that she remain off her feet as much as possible, wear support stockings, and take an aspirin each day.

On April 24 or 27, 2001, Madsen met with her supervisor, Mark Tobin, and told him that her physician had recommended that she remain off her feet as much as possible. She also told him that she was quitting, effective June 1, 2001, due to the contemplated surgery. She also told Tobin that she wanted to spend the summer with her children and that she did not want to punch a clock.

Tobin testified that he put a note in Madsen's file recording her resignation and indicating that her reasons for resigning were that the job was not what she wanted to be doing for the rest of her life, she needed time off for surgery on her legs, she did not like punching in for work, she was going to work with her mother at an auction house, and she wanted to spend the summer with her children.

Madsen testified that at the April 2001 meeting, she and Tobin had discussed that there were no jobs with the employer that would allow her to sit except in the binding department. Neither thought that the binding job would be appropriate because

Minn. Const. art. VI, § 10.

it was not full-time and would require a pay cut. Tobin testified that he told Madsen at the April 2001 meeting that he would allow her a week to change her mind about resigning. Tobin testified that he had discussed the bindery job with Madsen at the April meeting with her, but stated at the hearing that Madsen's request for "accommodation" of her health condition occurred only after Tobin received a written note, on May 31, 2001, from Madsen's physician setting forth her work restrictions.

On approximately May 15, 2001, Madsen visited a surgeon who advised her that she was not a surgery candidate.[1] Shortly thereafter, she again spoke with Tobin and asked him for a leave of absence instead of a resignation. Tobin indicated that he would investigate, and later reported to her that the company's president had already accepted her written resignation. Tobin and Madsen agreed that her last day of work would be June 1, 2001.

On May 31, 2001, Madsen provided Tobin a doctor's note stating that she "should be off her feet *as much* as possible." (Emphasis in original.) Tobin testified that he had assigned Madsen to the bindery that day, thereby accommodating her medical needs.

Madsen worked her last day on June 1, 2001. Respondent Department of Economic Security denied her subsequent application for unemployment benefits. That denial was affirmed by both the unemployment law judge and the commissioner's representative.

The commissioner's representative stated in part:

> [Madsen] gave her notice of quitting on April 27, 2001, well before she requested any sort of accommodation and well before she submitted to the employer any specific medical evidence that she be assigned other work. * * * She submitted a notice of resignation before she * * * submitted anything from her physician to the employer. The exception to disqualification is, therefore, not applicable.[2]

## ISSUE

Did relator, who discussed an alternate position within the company with her immediate supervisor, while offering her resignation due to a serious illness or injury that made it medically necessary for her to quit, make reasonable efforts to remain in her employment?

## ANALYSIS

Our review in economic security cases is narrow. *McGowan v. Executive Express Transp. Enters.*, 420 N.W.2d 592, 594 (Minn.1988). When reviewing a decision of the commissioner's representative, we consider whether there is reasonable support in the evidence to sustain the decision. *Tuff v. Knitcraft Corp.*, 526 N.W.2d 50, 51 (Minn.1995). We will not disturb the findings of the commissioner's representative when, viewed in the light most

---

1. In August 2001, Madsen visited the Mayo Clinic and was subsequently found to be eligible for limited corrective surgery.

2. Madsen states in her reply brief that she is not making an argument on appeal regarding the effectiveness of her attempt to rescind her resignation. Neither is there an argument on appeal regarding whether Madsen's decision to quit was based on serious illness. Respon-

dent's only reference to that question is to observe in its appellate brief that:

> If one would assume (not conceding its support by the record), that [Madsen's] decision to quit was based on a serious illness, the statute requires that [Madsen] have made "reasonable efforts" to remain in the employment, which reasonable efforts also by statute require that [she] ask the employer for a reasonable accommodation.

favorable to the decision, the findings are reasonably supported by the evidence. *Lolling v. Midwest Patrol,* 545 N.W.2d 372, 377 (Minn.1996). However, the construction of a statute is a question of law and we are not bound by the agency's conclusions. *Id.* at 375.

Applicants for unemployment benefits who quit their employment "shall be disqualified from all unemployment benefits." Minn.Stat. § 268.095, subd. 1 (Supp.2001). An exception exists where

the applicant's serious illness or injury made it medically necessary that the applicant quit, provided that the applicant made reasonable efforts to remain in that employment in spite of the serious illness or injury.

Reasonable efforts to remain in that employment are those a reasonable individual would make if interested in remaining with the employer and require that the applicant inform the employer of the serious illness or injury and request accommodation.

Minn.Stat. § 268.095, subd. 1(7).

Madsen argues that she would have continued in her employment had there been a job she could have performed consistent with her medical restrictions. Respondent argues that Madsen quit, disqualifying her from unemployment benefits, and that no statutory exemption prevents her disqualification. While respondent presents no cognizable argument that Madsen does not suffer from a serious illness or injury that made it medically necessary for her to quit, respondent argues that Madsen did not make reasonable efforts to remain in her employment or request accommodations, or that if she did, her only request for accommodations, her doctor's note provided on May 31, 2001, occurred after she had submitted her resignation.

Contrary to the commissioner's representative's determination that Madsen gave her notice of quitting well before she requested any sort of accommodation, the record reflects that Madsen made reasonable efforts to remain in her employment during the April 2001 meeting with Tobin. At that meeting, the unrefuted evidence shows that Madsen told Tobin that she had varicose veins, that her physician had told her to stay off her feet as much as possible, and that she intended to have surgery to correct the problem. She thus provided notice of her illness. The statute requires only notice to an employer that an employee is quitting for medical reasons; it does not require written notice from a physician. Furthermore, once being notified, the employer here did not ask for written proof.

Importantly, Tobin himself testified that he and Madsen had discussed transferring her to the bindery, but that she would work part-time and receive a pay cut if she did so.[3] Madsen testified that the bindery position was the only one at the facility where she could be off her feet.

The commissioner's representative failed to address this unrefuted testimony when concluding that Madsen did not request any accommodations. Madsen's efforts to discuss the alternate positions with her supervisor constitute, in these circumstances, "those a reasonable individual would make if interested in remaining with the employer." Although Madsen did not explicitly ask for a work "accommodation," it is evident from both parties' testimony that she and Tobin had discussed her condition, the problems she had standing all day, that the condition was severe enough

---

**3.** Had she been required to have taken that job, she would have had good cause to quit. *See* Minn.Stat. § 268.095, subd. 3(c) (2000) (good cause includes "substantial adverse change in the wages, hours, or other terms of employment by the employer").

to warrant surgery, and the possibility of a job in the bindery that required less standing. Both parties recognized that Madsen's job required her to stand all day. The only job in the facility, for which she was qualified, that did not require such standing would have constituted a cut in pay and hours. The statute requires "reasonable efforts," not exhaustive efforts. From these circumstances, the testimony reveals that the only possible accommodation that she and her supervisor felt was open to her was the bindery job. The law does not require her to ask for more.

Respondent also argues that because Madsen did not purchase compression stockings, which were recommended by her physician at the end of April, and because she quit before going through all the tests and procedures available to her, she did not use reasonable efforts under the circumstances to remain with her employer. However, the unrefuted evidence shows that at the end of April, Madsen's physician recommended that she remain off her feet as much as possible and that her condition was serious enough by that point to warrant surgery. There was no evidence that she could have remained on her feet for the entire shift if she wore compression stockings.

The commissioner's representative also noted that in addition to quitting to have surgery, Madsen also quit for various personal reasons, including spending more time with her children and non-medical work conditions. Madsen, while not disputing that there is evidence in the record to support the determination of the commissioner's representative as to these other reasons, argues that they are "more or less inflated conversation[al] tidbits that are being tu[r]ned around to make me look as if I never told him of my medical condition."

While we recognize the existence of possible non-medical reasons for Madsen's termination of her employment, respondent points to no authority for the proposition that a resignation must have been *solely* due to a medical condition in order for the serious-illness exception to apply. The statute states that the exception applies where the applicant quits "because the applicant's serious illness or disability made it medically necessary that the applicant quit." Minn.Stat. § 268.095, subd. 1(7). The statutory exception applies, despite the fact that Madsen may have had other reasons for quitting. *See Baker v. Fanny Farmer Candy Shops No. 154*, 394 N.W.2d 564, 566 (Minn.App.1986) (holding that employee had good cause to resign when employer breached agreement that employee would not have to work nights even though employee's stated reason for quitting was that she wished to work closer to home). The commissioner's representative did not find that Madsen quit for personal reasons alone.

## DECISION

█ Madsen notified her employer in April 2001 of her diagnosis, her physician's orders, and that she was contemplating surgery to correct her problems. At that meeting, Madsen and her supervisor also discussed the only available alternate position that would accommodate her need to remain off her feet, but that job would have mandated a pay cut and reduced hours; Madsen did not accept that position. These efforts constituted reasonable efforts to remain in her job. Madsen, therefore, falls within the medical necessity exception and is entitled to unemployment benefits.

**Reversed.**