*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0057**

Sondra Keeney,
Relator,

vs.

Midwest Special Services, Inc.,
Respondent,

Department of Employment and
Economic Development,
Respondent.

**Filed September 2, 2014
Affirmed
Johnson, Judge**

Department of Employment and
Economic Development
File No. 31637262-3

Teresa J. Ayling, Hellmuth & Johnson PLLC, Edina, Minnesota (for relator)

Midwest Special Services, Inc., c/o Talx UCM Services, Inc., St. Louis, Missouri (respondent)

Lee B. Nelson, Munazza Humayun, Department of Employment and Economic Development, St. Paul, Minnesota (for respondent department)

        Considered and decided by Connolly, Presiding Judge; Johnson, Judge; and Hooten, Judge.

UNPUBLISHED OPINION

**JOHNSON**, Judge

Sondra Keeney was employed by Midwest Special Services, Inc., until she quit due to stress and anxiety. An unemployment-law judge determined that she is ineligible for unemployment benefits. On appeal, she argues that she is eligible because she had a serious illness that made it medically necessary to quit and because she quit for a good reason caused by her employer. We affirm.

## FACTS

Midwest Special Services (MSS) is a training and rehabilitation program that provides job training and work experience for adults with mental, developmental, and physical disabilities. Keeney was employed by MSS from 2008 to 2009 and again from 2010 to September 2013.

Keeney worked as a case manager throughout her second period of employment with MSS. In that position, Keeney was responsible for organizing services for disabled individuals, such as health-care services, social services, and placement in a residential home or foster care. She also was responsible for monitoring disabled individuals at their job sites to ensure that their assigned tasks were performed properly and safely. If an issue arose at a job site, Keeney was responsible for counseling the individual in a confidential setting. The position of case manager required a 40-hour work week, and no overtime was allowed.

Keeney believed that her position was unduly stressful because she was responsible for performing too many tasks. She believed that the program was

2

understaffed and that MSS should have hired another case manager. Keeney requested that her position be reduced to 32 hours per week and that MSS hire an additional case manager to work the remaining hours. Her supervisor responded by saying that the case-manager position is a 40-hour-per-week position and informed her of an internal posting for a 30-hour-per-week position. Keeney did not apply for the other position.

In July 2013, Keeney began having anxiety at work because of her stress. That same month, she sought medical care for her anxiety, and her doctor prescribed her an anti-anxiety medication. Based on her doctor's advice, Keeney took a medical leave of absence from July 17 to August 17. Her doctor certified that she could return to work without medical restrictions on August 18, and she did so. On September 13, however, she had an anxiety attack at work. She called in sick on September 16, 17, and 18. On September 19, she submitted her resignation by e-mail.

Keeney applied for unemployment benefits. The department determined that she is ineligible. Keeney filed an administrative appeal. In November 2013, an unemployment-law judge (ULJ) held an evidentiary hearing and issued a written decision that also determined that Keeney is ineligible. After Keeney requested reconsideration, the ULJ affirmed his prior ruling. Keeney appeals by way of a petition for a writ of certiorari.

## D E C I S I O N

Keeney argues that the ULJ erred by determining that she is ineligible for unemployment benefits. She contends that she is eligible because she had a serious

illness that made it medically necessary to quit and because she quit for a good reason caused by her employer.

This court reviews a ULJ's decision denying benefits to determine whether the findings, inferences, conclusions, or decision are affected by an error of law or are "unsupported by substantial evidence in view of the entire record." Minn. Stat. § 268.105, subd. 7(d)(5) (2012). The evidentiary hearing is an evidence-gathering inquiry and is conducted without regard to any particular burden of proof. *See* Minn. Stat. § 268.069, subd. 2 (2012); *Vargas v. Northwest Area Found.*, 673 N.W.2d 200, 205 (Minn. App. 2004), *review denied* (Minn. Mar. 30, 2004). We view a ULJ's factual findings in the light most favorable to the ULJ's decision. *Skarhus v. Davanni's Inc.*, 721 N.W.2d 340, 344 (Minn. App. 2006). If the relevant facts are undisputed, we apply a *de novo* standard of review to the question whether an applicant is eligible for benefits. *Grunow v. Walser Auto. Grp. LLC*, 779 N.W.2d 577, 579 (Minn. App. 2010).

As a general rule, an applicant who quits employment is ineligible for unemployment benefits. Minn. Stat. § 268.095, subd. 1 (2012). "A quit from employment occurs when the decision to end the employment was, at the time the employment ended, the employee's." *Id.*, subd. 2(a). The general rule is, however, subject to a limited number of exceptions, two of which are implicated by Keeney's appeal.

### I. Serious-Illness Exception

An applicant may be eligible for unemployment benefits despite quitting her employment if she quit "because the applicant's serious illness or injury made it

4

medically necessary that the applicant quit." *Id.*, subd. 1(7). "This exception only applies if the applicant informs the employer of the medical problem and requests accommodation and no reasonable accommodation is made available." *Id.*

The ULJ found that the serious-illness exception does not apply because it was not medically necessary for Keeney to quit. The evidence in the record supports the ULJ's finding. Keeney's doctor certified that Keeney had no work restrictions after her medical leave of absence. Keeney testified that her doctor did not advise her that it was medically necessary to quit. Keeney did not introduce any other evidence that conflicts with the evidence indicating that it was not medically necessary for her to quit. *See Madsen v. Adam Corp.*, 647 N.W.2d 35, 38 (Minn. App. 2002) (concluding that relator's quit was medically necessary based in part on doctor's note). Thus, the ULJ did not err by concluding that the serious-illness exception does not apply.

## II. Good-Reason-to-Quit Exception

An applicant also may be eligible for unemployment benefits despite quitting her employment if she quit for a good reason caused by the employer. Minn. Stat. § 268.095, subd. 1(1). This exception applies only if the employee quit for a reason "(1) that is directly related to the employment and for which the employer is responsible; (2) that is adverse to the worker; and (3) that would compel an average, reasonable worker to quit and become unemployed rather than remaining in the employment." *Id.*, subd. 3(a). These three requirements "must be applied to the specific facts of each case." *Id.*, subd. 3(b). In addition, an employee seeking to invoke this exception "must complain to

5

the employer and give the employer a reasonable opportunity to correct the adverse working conditions." *Id.*, subd. 3(c).

Keeney contends that she had good reason to quit caused by her employer because her job was too demanding and, thus, too stressful. To satisfy the statutory exception, an applicant's reason for quitting must be "real, not imaginary, substantial not trifling, and reasonable, not whimsical; there must be some compulsion produced by extraneous and necessitous circumstances." *Ferguson v. Department of Emp't Servs.*, 311 Minn. 34, 44 n.5, 247 N.W.2d 895, 900 n.5 (1976) (quotation omitted). Generally, the exception applies only in extreme situations, such as if "the employer made unreasonable demands of [an] employee that no one person could be expected to meet." *Zepp v. Arthur Treacher Fish & Chips, Inc.*, 272 N.W.2d 262, 263 (Minn. 1978). For example, in *Zepp*, the employer substantially increased an employee's duties and, more importantly, doubled his work hours. *Id.* But the exception "does not encompass situations . . . where the employee is simply frustrated or dissatisfied with his working conditions." *Portz v. Pipestone Skelgas*, 397 N.W.2d 12, 14 (Minn. App. 1986). The working conditions must be so adverse that they "would compel an average, reasonable worker to quit and become unemployed rather than remaining in the employment." Minn. Stat. § 268.095, subd. 3(a)(c). This is an objective test, and the "correct standard . . . is the standard of reasonableness as applied to the average man or woman, and not to the supersensitive." *Werner v. Medical Prof'ls LLC*, 782 N.W.2d 840, 843 (Minn. App. 2010) (quotation omitted), *review denied* (Minn. Aug. 2010).

Keeney's argument concerning medical necessity suggests that she is not an average, reasonable worker. Regardless, we agree with the ULJ that Keeney's reasons for quitting are not so objectively adverse as to compel an average, reasonable employee to quit. *See* Minn. Stat. § 268.095, subd. 3(a). The ULJ actually credited Keeney's testimony concerning the stressful nature of her position, noting that the "work was inherently stressful, because it involved intensive management and vocational guidance of persons with disabilities." But the ULJ ultimately found that the situation was not so extreme such that there was a good reason to quit caused by the employer. The ULJ made this finding after noting that Keeney's "working conditions were safe, she was not required to work a significant amount of overtime, she was allowed breaks, and she was not subjected to harassment or abuse." The evidence in the record supports the ULJ's analysis. Keeney was expected to perform the same job duties as other case managers and was not subjected to negative treatment by her supervisors. She was not expected to work any overtime. She does not dispute that the demands of the position did not change throughout her employment. Although her job may have been stressful, her employer was not extremely demanding such that an average, reasonable worker would quit.

Thus, the ULJ did not err by finding that Keeney did not quit her job for a good reason caused by her employer.

### III. Procedural Matters

Keeney also argues that, for three reasons, the ULJ erred by failing to fully develop the record. In conducting a hearing after an administrative appeal, a ULJ has an obligation to conduct an "evidence-gathering inquiry" to "ensure that all relevant facts

7

are clearly and fully developed." Minn. Stat. § 268.105, subd. 1(b); *see also* Minn. R. 3310.2921 (2013); *Ywswf v. Teleplan Wireless Servs., Inc.*, 726 N.W.2d 525, 529 (Minn. App. 2007).

Keeney first contends that the ULJ erred by not eliciting additional evidence concerning the 30-hour-per-week position. She asserts that additional evidence on this issue might have allowed her to prove that she quit for a good reason caused by the employer. But she does not explain how additional evidence would help her establish that exception. The 30-hour-per-week position was not the position Keeney held at the time of her resignation. It does not appear that additional evidence on that issue would have justified Keeney's decision to quit her 40-hour-per-week case-manager position.

Keeney also contends that the ULJ erred by not questioning her more thoroughly concerning her conversation with her doctor regarding her anxiety. Keeney provided testimony on this issue. The ULJ also received documentary evidence reflecting the doctor's treatment decisions. There is no apparent reason for the ULJ to believe that it was necessary to elicit additional evidence on this issue beyond what Keeney chose to offer.

Keeney last contends that the ULJ erred by not making any credibility determinations. It does not appear, however, that any credibility findings were necessary because the evidence concerning the historical facts was not in conflict. *See* Minn. Stat. § 268.105, subd. 1(c) (2012). The parties largely agreed on what had occurred; the ULJ applied the relevant law to the undisputed facts and concluded that the two exceptions to the quit rule do not apply.

8

Thus, the ULJ did not err by failing to fully develop the record.

**Affirmed.**